## UNITED STATES DISTRICT COURT
## BOSTON, MASSACHUSETTS

MASSACHUSETTS DEPARTMENT OF )
SOCIAL SERVICES )
and )
Margaret BUKENYA (A79 679 221) )
Plaintiffs, )
)
v. )
Denis RIORDAN, District Director of
Boston District Office(CIS); )
Michael CHERTOFF, as Secretary of Department of )
Homeland Security; )
EDUARDO AGUIRRE, JR. as Director of United States )
Citizenship and Immigration Services (US CIS); )
DEPARTMENT OF HOMELAND   SECURITY; )
and ALL UNKNOWN GOVERNMENT AGENCIES )
INVOLVED IN SECURITY CHECKS )
FOR APPLICANTS , )
Defendants )
)

**05  10943 DPW**

CIVIL ACTION FILE NO.

COMPLAINT FOR
DECLARATORY
RELIEF IN THE NATURE
OF MANDAMUS AND
REQUEST FOR SPEEDY
HEARING

MAGISTRATE JUDGE _Collings_

## I.
## INTRODUCTION

1.    This is an individual action for declaratory and mandatory relief, authorized by the Declaratory Judgment Act, 28 USC Section 2201 and 28 USC Section 1361, and the Administrative Procedure Act, 5 USC Section 551 et seq. This action challenges the Defendants' failure to adjudicate the special immigrant juvenile petition and application for adjustment of status which Plaintiffs filed in October 2002. This includes a request for speedy hearing because delay in adjudication creates hardship for the Plaintiffs and further traumatizes Margaret, an orphan who has been physically abused and is deserving of relief.

## II.
## JURISDICTION

2.    This Court has jurisdiction over the present action pursuant to 28 USC Section 1331, Federal Question Jurisdiction; and 28 USC Section 2201, the Declaratory Judgment Act; 5 USC Section 702, the Administrative Procedures Act; 28 USC Section 1361, regarding an action to compel an officer of the United States to perform his duty.

## III.
## VENUE

3.      28 USC Section 1391(e), as amended, provides that in a civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity, the action may be brought in any judicial district in which the Plaintiff or a Defendant in the action resides. Plaintiff, Department of Social Services (DSS), is a Massachusetts state agency with headquarters at   24 Farnsworth St., Boston, Massachusetts, 02110. Margaret Bukenya is a "child"[1] in DSS custody in Massachusetts. Defendant, Denis Riordan, is District Director of the Boston CIS office that has failed to adjudicate this case. Mr. Riordan's office is located at the John F. Kennedy Federal Building, Government Center, Boston, MA 02203.

## IV.
## PLAINTIFFS

4.      Plaintiff, Department of Social Services (DSS), is the  Massachusetts child welfare agency. DSS filed a special immigrant juvenile petition for Margaret Bukenya.

5.      Plaintiff, Margaret Bukenya is an 18 year-old youth from Uganda. She has been in DSS custody since June 27, 2001. She filed an application for adjustment of status (a green card) based upon the DSS petition.

6.      Both DSS and Margaret Bukenya are within the zone of interest controlled by this action and therefore also have standing.

## V.
## DEFENDANTS

7.      Defendant, the Department of Homeland Security, is a Federal agency that is mandated under the law through its Director, 8 USC Section 1103(a), to supervise, implement, and enforce the Immigration and Nationality Act, including special immigrant juvenile petitions and applications for adjustment of status.

8.      Defendant, Michael Chertoff, is the duly appointed Secretary of Homeland Security and charged under the law, 8 USC Section 1103(a), with supervising, implementing, and enforcing the Immigration and Nationality Act.

9.      Defendant, Eduardo Aguirre, Jr., is the duly appointed Director of United States Citizenship and Immigration Services (CIS), and charged under the law, 8 USC 1103(c), with the implementation of benefits under the Immigration and Nationality Act.

---

[1]Child is defined under U.S. immigration law as unmarried person under age 21. 8 USC 1101(b)(1).

10.    Defendant, Denis Riordan is the District Director of the Boston District Office of U.S. Citizenship and Immigration Services (CIS) This is the office where the Plaintiffs' petition and application have been pending since October 2002.

11.    Defendants, Department of Homeland Security and Unknown Government Agencies, are those additional government agencies unknown to the Plaintiffs or Plaintiffs' counsel, that may also be involved with processing security checks for applicants for adjustment of status processed by the Department of Homeland Security.

## VI.
## FACTUAL ALLEGATIONS

12.    On July 23, 2001, DSS obtained custody of Margaret Bukenya, through a care and protection petition. Her parents both died of AIDS in Uganda and she had been severely abused and treated as a servant by the caretakers in Uganda. (See Affidavit of Margaret and Letter from Mental Health Counselor, Jonakarina Whisenant included in Exhibit E.)

13.    On January 29, 2002, the Framingham Juvenile Court issued an order declaring that Margaret had been committed to DSS custody due to abuse, neglect or abandonment and finding that it was not in her best interest to be returned to Uganda (Included in Exhibit A).

14.    In October 2002, DSS filed a special immigrant petition for Margaret together with Margaret's application for adjustment of status (I-360/485.) This green card application was filed at the Boston District Office of U.S. Citizenship and Immigration Services (CIS). (Reconstructed application, Exhibit A).

15.    On June 18, 2003 the Plaintiffs (DSS social worker and Maraget) attended an interview at the Boston Citizenship and Immigration Services (then called INS).

16.    On September 24, 2003 the Immigration Officer requested additional documents: a true birth certificate for Margaret and her parents' death certificates. Plaintiffs provided the birth and death certificates requested on December 18, 2003 (Exhibit B).

17.    On September 27, 2004, Plaintiffs submitted a letter from DSS Commissioner Lewis H. Spence to Defendant, Denis Riordan asking for help resolving long delayed adjudications. The letter explained "these delays cause real hardship for the children and severely tax the limited resources within our offices." The letter included a list of long delayed cases which included this one for Margaret Bukenya. (Exhibit C). The letter suggested a meeting and invited suggestions for resolving these cases.

18.    On October 14, 2004, the Defendants issued a notice of intent to deny Plaintiffs case. The reason given was that questions about her birth certificate and her parent's death certificates. Specifically, the information was not exactly the same as Margaret had stated and the death

certificates indicated "natural causes" rather than AIDS as cause of death. Also, the death certificates were issued in 2003 rather than the time of death (Exhibit D).

19.    On November 22, 2004, Plaintiffs submitted a response to the notice of intent to deny. This included affidavits from Margaret and her social worker about how they got the birth and death certificates. Margaret explains that she was separated from her parents at a young age before she could read or write. She knew her father had died of AIDS because relatives told her and she saw him dead. She assumed her mother was dead too because her mother did not come to get her when she was living with relatives as a sort of servant girl. She explains that she only learned the date of her mother's death and her true name years later when she got the death certificate (Exhibit E).

20.    In addition, the Plaintiff's rebuttal packet (Exhibit E) included a letter from Jonakarina Whisenant, her counselor for three years which vouched for Margaret's credibility. She states:

> "I have no proof that Margaret's parents are dead, however ... Her descriptions were expressed with a heartfelt guttural sadness that would be quite difficult for any human being to fabricate. The descriptions of abuse that Margaret described were horrific, extensive and filled with the kind of repeated detail that if fabricated would require extensive study to repeat...

> "Margaret also, on many occasions, describes her feelings of extreme longing for her own parents and the kind of love that only one's own parents could provide...

> "In conclusion, it is my opinion that Margaret is telling the truth and her parents are deceased. It is also my opinion after working with Margaret for three years that she has experienced serious trauma and would be at significant risk should she be returned to Uganda. I can report that there was no evidence of psychosis or delusions and her story unfolded with the kind of detail and emotion that would be highly difficult to fabricate."

21.    Also, on October 21, 2004, Plaintiffs through counsel sent Defendants another letter expressing frustration with the pattern of delay in adjudicating special immigrant juvenile cases and requesting a meeting between the two agencies to clarify apparent misunderstandings about child welfare law in Massachusetts. (Exhibit F) Defendant, Mr. Riordan verbally agreed to a meeting but said he wanted to involve someone from Headquarters. No meeting has been set.

22.    Thereafter, the interviewing Immigration Officer called counsel to ask to see Margaret's original passport. A paralegal from counsel's office took Margaret's passport to the officer at Defendant's Boston office on February 10, 2003.

23.    On February 24, 2005, present counsel for Plaintiffs sent Defendants a letter entitled Notice of Intent to File Mandamus Action in Federal District Court. That letter listed 5 long overdue cases, including this one. (See Exhibit G). Defendants have verbally acknowledged receipt of this letter (and approved two of the cases). This case remains pending.

## VII.
## CLAIM FOR RELIEF

24.     Defendants have willfully, and unreasonably refused to adjudicate Plaintiffs pending petition and applications filed pursuant to 8 USC 1101 (a)(27)(J); 8 USC 1255 (h) and 8 CFR 204.11.

25.     Plaintiffs counsel has made many phone calls, written letters, asked for meetings, given advance notice of intent to file this mandamus. Yet Defendants have failed to adjudicate this case. Plaintiffs have exhausted any administrative remedies that may exist.

26.     Strong humanitarian factors genuinely exist in these circumstances as Plaintiffs have made every effort to file their application early, to provide all necessary documentation to the Defendants, they have diligently follow-up with DHS to obtain a timely decision in this case. Failure of the government to grant this case will have a devastating effect on Margaret Bukenya's life.

27.     Special immigrant juvenile status was created for juveniles like Margaret, who have been placed in state custody because they have been abused, neglected or abandoned. Margaret has been in DSS custody for almost four years. During that time she has been in related to the loss of her parents and the abuse she has suffered.

28.     Instructions from Defendants' CIS Headquarters in Washington, D.C. specifically urge District Offices not to second guess the juvenile court rulings and to take precautions and expedite cases, like Margaret Bukenya's, to avoid "aging out" (Exhibit H). Plaintiffs submitted a copy of this memorandum to Defendants on October 21, 2004 (Included in Exhibit F.) This mandamus action simply seeks to compel the Defendants abide by the law and to follow the instructions from their own Headquarters.

**WHEREFORE,** Plaintiffs pray that the Court:

(1) Schedule a speedy hearing;

(2) Compel Defendants, and those acting under them, to perform their duty to adjudicate the Plaintiffs' special immigrant petition and application for adjustment of status. This includes completion of the random security check, if necessary;

(3) Compel the Defendants to adjudicate this case;

(4) Compel the Defendants to issue timely approval notices which will enable Margaret to work and go to college; and

(5) Grant such other and further relief as this Court deems proper under the circumstances.

RESPECTFULLY SUBMITTED this 6th day of May, 2005.


Maureen O'Sullivan
Counsel for Plaintiffs
Kaplan O' Sullivan & Friedman LLP
10 Winthrop Square 3rd Fl
Boston, MA 02110
(617) 482-4500

## CERTIFICATE OF SERVICE

This is to certify that I have this day served copies of the foregoing COMPLAINT FOR DECLARATORY RELIEF AND RELIEF IN THE NATURE OF MANDAMUS by hand delivery to:

> Denis Riordan,  District Director
> Boston District Office
> U.S. Department of Homeland Security
> USCIS
> 15 New Sudbury St.
> JFK Federal Building
> Boston, MA 02203
>
> Henry Hanley, Esq
> Litigation Unit
> Department of Homeland Security (INS)
> Room 425
> 15 New Sudbury St.
> JFK Federal Building
> Government Center
> Boston, MA 02203.
>
> U.S. Attorneys Office
> U.S. Courthouse, Suite 9200
> 1 Courthouse Way
> Boston, MA 02110

This 6th day of May, 2005. Counsel will also provide formal service to all Defendants with summons, but has already hand delivered these copies due to the urgent nature of the case.

Maureen O'Sullivan
Counsel for Plaintiffs
Kaplan O' Sullivan & Friedman LLP
10 Winthrop Square 3rd Fl
Boston, MA 02110
(617) 482-4500

# LIST OF EXHIBITS

EXHIBIT A        Reconstructed copy of petition and application for special immigrant status.

EXHIBIT B        Packet of additional supporting documents delivered to Defendants on September 25, 2003.

EXHIBIT C        Letter from Plaintiffs, DSS Commissioner, to Defendant requesting adjudication of long delayed cases with attached list that includes Margaret Bukenya's case, September 27, 2004.

EXHIBIT D        Defendant's notice of intent to deny this case, October 14, 2004.

EXHIBIT E        Plaintiffs response to notice of intent to deny, November 22, 2004.

EXHIBIT F        Plaintiffs letter to Defendant requesting a meeting to resolve recurring issues in special immigrant juvenile cases, October 21, 2004.

EXHIBIT G        Plaintiffs notice to Defendants of notice of intent to file mandamus action, February 24, 2005.

EXHIBIT H        Defendants Memorandum #2 Field Guidance on Special Immigrant Juvenile Status petitions.

# EXHIBIT A

Reconstructed copy of petition
and application for special
immigrant status

KAPLAN, O'SULLIVAN & FRIEDMAN, LLP
ATTORNEYS AT LAW

TEN WINTHROP SQUARE • THIRD FLOOR   BOSTON, MASSACHUSETTS 02110

HARVEY KAPLAN
MAUREEN O'SULLIVAN
JEREMIAH FRIEDMAN

(617) 482-4500
FAX: (617) 422-0997

October 30, 2002

U.S. Immigration and Naturalization Service
JFK Federal Building
Government Center
Boston, MA  02203

Re:  **Margret Bukenya**
     **Application for Special Immigrant Juvenile Status**

Dear Sir/Madam:

Please find enclosed a special immigrant petition and application for adjustment of status for Margret Bukenya.  Specifically, I have enclosed the following:

1.   Form G-28, Notice of Entry of Appearance as Attorney;
2.   Form I-360, petition for special immigrant status;
3.   Court order specifying Margret Bukenya was a minor when she was declared dependent upon the court and eligible for long term foster care.  The court order also states that it is not in her best interest to return home;
4.   Form I-485 w/photos;
5.   Form G-325A, biographic information;
6.   Form I-181 processing sheet;
7.   Affidavit in support of fee waiver;
8.   I-765 form;
9.   Passport;
10.  Medical Evaluation;
11.  Evidence of abuse, abandonment or neglect;

Please note that Margret Bukenya is dependent upon the Commonwealth of Massachusetts.  Therefore, please waive the fee for humanitarian reasons and schedule her appointment.  Thank you.

Sincerely yours,

Maureen O'Sullivan

## NOTICE OF ENTRY OF APPEARANCE AS ATTORNEY OR REPRESENTATIVE

| In re: _Margret Bukenya - Applicant_ | DATE  11 |
|---|---|
| | FILE No. |

I hereby enter my appearance as attorney for (or representative of), and at the request of, the following named person(s):

NAME _Attn: Ms. Doreen Brook's_
_Department of Social Services_    ☒ Petitioner    ☐ Applicant
                                    ☐ Beneficiary    ☐

ADDRESS (Apt. No.)    (Number & Street)    (City)    (State)    (ZIP Code)
_63 Fountain St.    Framingham MA    01702_

NAME    ☐ Petitioner    ☐ Applicant
        ☐ Beneficiary    ☐

ADDRESS (Apt. No.)    (Number & Street)    (City)    (State)    (ZIP Code)

Check applicable item(s) below:

☒ 1. I am an attorney and a member in good standing of the bar of the Supreme Court of the United States or of the highest court of the following State, territory, insular possession, or District of Columbia
   _Massachusetts_    _Supreme Judicial Court and/or District Court_    and am not under a
                                    (Name of Court)
   court or administrative agency order suspending, enjoining, restraining, disbarring, or otherwise restricting me in practicing law.

☐ 2. I am an accredited representative of the following named religious, charitable, social service, or similar organization established in the United States and which is so recognized by the Board:

☐ 3. I am associated with _____,
   the attorney of record who previously filed a notice of appearance in this case and my appearance is at his request.   (If you check this item, also check item 1 or 2 whichever is appropriate.)

☒ 4. Others (Explain fully.)
   IT IS RESPECTFULLY REQUESTED THAT IN CONFORMITY WITH PUBLIC LAW 90-83, 5 U.S.C. 500(f), 81 STAT. 195, THE UNDERSIGNED BE GIVEN NOTICE OF ALL COMMUNICATIONS, WRITTEN OR OTHERWISE, IN THIS CASE.

| SIGNATURE | COMPLETE ADDRESS |
|---|---|
| | Kaplan, O'Sullivan, & Friedman, LLP |
| | Ten Winthrop Square, Third Floor |
| | Boston          MA 02110 |
| NAME (Type or Print) _Maureen O'Sullivan_ | TELEPHONE NUMBER (617) 482-4500 |

PURSUANT TO THE PRIVACY ACT OF 1974, I HEREBY CONSENT TO THE DISCLOSURE TO THE FOLLOWING NAMED ATTORNEY OR REPRESENTATIVE OF ANY RECORD PERTAINING TO ME WHICH APPEARS IN ANY IMMIGRATION AND NATURALIZATION SERVICE SYSTEM OF RECORDS: ___Harvey Kaplan, Maureen O'Sullivan & Jeremiah Friedman___
                                    (Name of Attorney or Representative)

THE ABOVE DISCLOSURE IS IN CONNECTION WITH THE FOLLOWING MATTER:
ANY AND ALL MATTERS BEFORE THE US IMMIGRATION AND NATURALIZATION SERVICE CONCERNING THE ABOVE.

| NAME OF PERSON CONSENTING _Doreen Brooks_ _Margaret Bukenya_ | SIGNATURE OF PERSON CONSENTING _Doreen Brooks_ X _Margaret Bukenya_ | DATE _6-27-02_ |
|---|---|---|

(NOTE: Execution of this box is required under the Privacy Act of 1974 where the person being represented is a citizen of the United States or an alien lawfully admitted for permanent residence.)

Form G-28
(Rev. 10-25-79)N                              (OVER)                    UNITED STATES DEPARTMENT OF JUSTICE
                                                                        Immigration and Naturalization Service

UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

Processing Sheet

Application of
Petition Form No. _____I-485_____     File No. _____--_____

I-181 Information Sheet

**NAME**    Margret Bukenya

**ADDRESS**    Department of Social Services
ATTN: Doreen Brooks
63 Fountain Street
Framingham,MA 01702

**SEX**    Female
**DATE OF BIRTH**    08/15/1986
**CITY OF BIRTH**    Muzinge
**COUNTRY OF BIRTH** Uganda
**COUNTRY OF NATIONALITY** Uganda
**COUNTRY OF LAST RESIDENCE**    Unganda
**MARITAL STATUS** Single
**OCCUPATION** Unemployed
**NONIMMIGRANT CLASS AT TIME OF APPLICATION** N/A
**YEAR ADMITTED TO US**

**US CONSULATE POST WHERE YOU RECEIVED YOUR NONIMMIGRANT VISA**
N/A

**DATE NONIMMIGRANT VISA ISSUED N/A**
**NUMBER OF NONIMMIGRANT VISA**    N/A
**CLASSIFICATION OF NONIMMIGRANT** N/A

**MOTHER'S FIRST NAME**    Joyuret
**FATHER'S FIRST NAME**    Francis
**PRIORITY DATE**    None
**PREFERENCE**    N/A
**COUNTRY TO WHICH CHARGEABLE** Uganda

OMB No. 1115-0117

**U.S. Department of Justice**
Immigration and Naturalization Service

Petition for Amerasian, Widow or Special Immigrant

## START HERE - Please Type or Print

| | FOR INS USE ONLY |
|---|---|

**Part 1. Information about person or organization filing this petition.** (Individuals should use the top name line; organizations should use the second line.) If you are a self-petitioning spouse or child and do not want INS to send notices about this petition to your home, you may show an alternate mailing address here. If you are filing for yourself and do not want to use an alternate mailing address, skip to part 2.

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

Company or Organization Name: *Department of Social Services*

Address - C/O: *Doreen Brooks, DSS Worker*

| Street Number and Name | *63 Fountain Street* | Apt. # |
|---|---|---|

| City *Framingham* | State or Province *MA* |
|---|---|

| Country *USA* | ZIP/Postal Code *01702* |
|---|---|

| U.S. Social Security # | A # | IRS Tax # (if any) |
|---|---|---|

### Part 2. Classification Requested (check one):

a. ☐ Amerasian
b. ☐ Widow(er) of a U.S. citizen who died within the past 2 years
c. ☑ Special Immigrant Juvenile
d. ☐ Special Immigrant Religious Worker
e. ☐ Special Immigrant based on employment with the Panama Canal Company, Canal Zone, Government or U.S. Government in the Canal Zone
f. ☐ Special Immigrant Physician
g. ☐ Special Immigrant International Organization Employee or family member
h. ☐ Special Immigrant Armed Forces Member
i. ☐ Self-Petitioning Spouse of Abusive U.S. Citizen or Lawful Permanent Resident
j. ☐ Self-Petitioning Child of Abusive U.S. Citizen or Lawful Permanent Resident
k. ☐ Other, Explain:

### Part 3. Information about the person this petition is for.

| Family Name *Bukenya* | Given Name *Margret* | Middle Initial *N* |
|---|---|---|

Address - C/O:

| Street Number and Name | *34 Charles Street* | Apt. # |
|---|---|---|

| City *Framingham* | State or Province *MA* |
|---|---|

| Country *USA* | ZIP/Postal Code |
|---|---|

| Date of Birth (Month/Day/Year) *8/15/86* | Country of Birth *Uganda* |
|---|---|

| U.S. Social Security # (if any) | A # (if any) |
|---|---|

Marital Status: ☑ Single  ☐ Married  ☐ Divorced  ☐ Widowed

Complete the items below if this person is in the United States:

| Date of Arrival (Month/Day/Year) *6/21/00* | I-94# *324 729 121 08* |
|---|---|

| Current Nonimmigrant Status *B-2 (overstay)* | Expires on (Month/Day/Year) *12/00/2000* |
|---|---|

*B-2 overstay*

*Continued on back.*

Form I-360 (Rev. 03/07/96) N

**FOR INS USE ONLY** (right column):

Returned | Receipt

Resubmitted

Reloc Sent

Reloc Rec'd

☐ Petitioner/ Applicant Interviewed
☐ Beneficiary Interviewed
☐ I-485 Filed Concurrently
☐ Bene "A" File Reviewed

Classification

Consulate

Priority Date

Remarks:

Action Block

To be Completed by Attorney or Representative, if any
☐ Fill in box if G-28 is attached to represent the applicant

VOLAG #

ATTY State License #
BBO MA 640820

## Part 4. Processing Information.

Below give the United States Consulate you want notified if this petition is approved and if any requested adjustment of status cannot be granted.

| American Consulate:  City | Country |
|---|---|

If you gave a United States address in Part 3, print the person's foreign address below. If his/her native alphabet does not use Roman letters, print his/her name and foreign address in the native alphabet.

| Name | Address |
|---|---|

Sex of the person this petition is for.  ☐ Male  ☒ Female

Are you filing any other petitions or application with this one?  ☐ No  ☒ Yes (How many? 1   I-485   )

Is the person this petition is for in exclusion of deportation proceedings?  ☒ No  ☐ Yes (Explain on a separate sheet of paper)

Has the person this petition is for ever worked in the U.S. without permission?  ☒ No  ☐ Yes (Explain on a separate sheet of paper)

Is an application for adjustment of status attached to this petition?  ☐ No  ☒ Yes

## Part 5. Complete only if filing for an Amerasian.

Section A.  Information about the mother of the Amerasian.

| Family Name | Given Name | Middle Initial |
|---|---|---|

Living?  ☐ No (Give date of death _____ )  ☐ Yes (Complete address line below)  ☐ Unknown (attach a full explanation)

Address

Section B.  Information about the father of the Amerasian.   If possible, attach a notarized statement from the father regarding parentage.  Explain on separate paper any question you cannot fully answer in the space provided on this form.

| Family Name | Given Name | Middle Initial |
|---|---|---|

| Date of Birth (Month/Day/Year) | Country of Birth |
|---|---|

Living?  ☐ No (Give date of death _____ )  ☐ Yes (Complete address line below)  ☐ Unknown (attach a full explanation)

Home Address

| Home Phone # | Work Phone # |
|---|---|

At the time the Amerasian was conceived:

☐ The father was in the military (indicated branch of service below - and give service number here): _____

   ☐ Army   ☐ Air Force   ☐ Navy   ☐ Marine Corps   ☐ Coast Guard

☐ The father was a civilian employee abroad. Attach a list of names and addresses of the organizations which employed him at that time.

☐ The father was not in the military, and was not a civilian employed abroad.  *(Attach a full explanation of the circumstances.)*

## Part 6. Complete only if filing for a Special Immigrant Juvenile Court Dependent.

Section A.  Information about the Juvenile.

List any other names used.

Answer the following questions regarding the person this petition is for.  If you answer "no" explain on a separate sheet of paper.

Is he or she still dependent upon the juvenile court or still legally committed to or under the custody of an agency or department of a state?  ☐ No  ☒ Yes

Does he/she continue to be eligible for long term foster care?  ☐ No  ☒ Yes

*Continued on next page*

**Part 7.** **Complete only if filing as a Widow/Widower, a Self-petitioning Spouse of an Abuser, or as a Self-petitioning Child of an Abuser**

Section A. Information about the U.S. citizen husband or wife who died or about the U.S. citizen or lawful permanent resident abuser.

| Family Name | Given Name | Middle Initial |
|---|---|---|

| Date of Birth (Month/Day/Year) | Country of Birth | Date of Death (Month/Day/Year) |
|---|---|---|

He or she is now, or was at time of death on (check one)

- ☐ U.S. Citizen born in the United States.
- ☐ U.S. Citizen born abroad to U.S. citizen parents.
- ☐ U.S. Citizen through Naturalization (Show A #) _____
- ☐ U.S. lawful permanent resident (Show A #) _____
- ☐ Other, explain

Section B. Additional Information about you.

| How many times have you been married? | How many times was the person in Section A married? | Give the date and place you and person in section A were married. (If you are a self-petitioning child, write: "N/A") |
|---|---|---|

When did you live with the person named in Section A? From (Month/Year)_____ until (Month/Year)_____

If you are filing as a widow/widower, were you legally separated at the time of the U.S. citizens's death? ☐ No    ☐ Yes,  (attach explanation).

Give the last address at which you lived together with the person named in Section A, and show the last date you lived together with that person at that address:

If you are filing as a self-petitioning spouse, have any of your children filed separate self-petitions? ☐ No   ☐ Yes (show child(ren)'s full names):

**Part 8.** **Information about the spouse and children of the person this petition is for.**  A widow/widower or a self-petitioning spouse of an abusive citizen or lawful permanent resident should also list the children of the deceased spouse or of the abuser

| A. | Family Name | N/A | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|---|
| | Country of Birth | | Relationship ☐ Spouse ☐ Child | | A # |

| B. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| C. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| D. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| E. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| F. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

Form I-360 (Rev 03/07/96)N

| G. Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|
| Country of Birth | Relationship ☐ Child | | A # |

| H. Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|
| Country of Birth | Relationship ☐ Child | | A # |

## Part 9. Signature.

*Read the information on penalties in the instructions before completing this part. If you are going to file this petition at an INS office in the United States, sign below. If you are going to file it at a U.S. consulate or INS office overseas, sign in front of a U.S. INS or consular official.*

I certify, or, if outside the United States, I swear or affirm, under penalty of perjury under the laws of the United States of America, that this petition, and the evidence submitted with it, is all true and correct. If filing this on behalf of an organization, I certify that I am empowered to do so by that organization. I authorize the release of any information from my records, or from the petitioning organization's records, which the Immigration and Naturalization Service need to determine eligibility for the benefit being sought.

| Signature *Doreen Brooks (DSS)* | | Date 6-27-02 |
|---|---|---|
| Signature of INS or Consular Official | Print Name *Doreen Brooks* | Date 6-27-02 |

*Please Note:  If you do not completely fill out this form, or fail to submit required documents listed in the instructions, then the person(s) filed for may not be found eligible for a requested benefit, and it may have to be denied.*

## Part 10.  Signature of person preparing form if other than above. (sign below)

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| Signature | Print Your Name Maureen O'Sullivan/Monica M. L | Date |
|---|---|---|

| Firm Name and Address | Kaplan, O'Sullivan and Friedman, LLP. 10 Winthrop Square, 3rd floor, Boston, MA  02110 |
|---|---|

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

Juvenile Court
Framingham Division
Docket No.0149CP023

\* \* \* \* \* \* \* \* \* \* \*
IN RE:
Margret Bukenya
\* \* \* \* \* \* \* \* \* \* \*

## ORDER REGARDING MINOR'S ELIGIBILITY
## FOR SPECIAL IMMIGRATION STATUS

Upon the consideration of the testimony and/or documents submitted to date, the Court finds the following:

1. The minor was declared dependent on the Framingham Juvenile Court of the County of Middlesex on January 29, 2002 or was committed to the custody of the Commonwealth on that date due to abuse, neglect or abandonment.

2. On January 29, 2002, the minor was deemed eligible by this Court for long term foster care due to abuse, neglect or abandonment.

3. The Court finds that it is not in the best interest of the minor to be returned to her or her parents' previous country of nationality or the country of last habitual residence, Uganda. It is in the minor's best interest to remain in the United Sates.

An application is to be made to the Immigration and Naturalization Service pursuant to 8 USC Section 1101 (a) (27) (j).

Judge Gail Garinger

1/29/02

I HEREBY CERTIFY THAT THIS DOCUMENT
IS A TRUE COPY OF A DOCUMENT FILED
WITH THE OFFICE OF THE CLERK-MAGISTRATE
OF THIS COURT

CLERK-MAGISTRATE

OMB No. 1115-0053

**U.S. Department of Justice**
Immigration and Naturalization Service

**Form I-485, Application to Register
Permanent Residence or Adjust Status**

| | FOR INS USE ONLY |
|---|---|

**START HERE - Please Type or Print**

**Part 1. Information about you.**

Family Name: *Bukenya*   Given Name: *Margret*   Middle Initial: *N.*

Address - C/O: *Ms. Doreen Brooks*
*Department of Social Services*

Street Number and Name: *63 Fountain Street*   Apt. #:

City: *Framingham, MA*

State: *MA*   Zip Code: *01702*

Date of Birth (month/day/year): *8/15/86*   Country of Birth: *Uganda*

Social Security #: *None*   A # (if any): *None*

Date of Last Arrival (month/day/year): *6/11/00*   I-94 #: *324729121 08*

Current INS Status: *B-2 (overstay)*   Expires on (month/day/year): *12/20/2000 (overstay)*

FOR INS USE ONLY:
- Returned ___ Receipt
- Resubmitted
- Reloc Sent
- Reloc Rec'd
- ☐ Applicant Interviewed

**Part 2. Application Type.** *(Check one)*

I am applying for adjustment to permanent resident status because

a. ☑ an immigrant petition giving me an immediately available immigrant visa number has been approved. (Attach a copy of the approval notice-- or a relative, special immigrant juvenile, or special immigrant military visa petition filed with this application that will give you an immediately available visa number, if approved.)

b. ☐ My spouse or parent applied for adjustment of status or was granted lawful permanent residence in an immigrant visa category that allows derivative status for spouses and children.

c. ☐ I entered as a K-1 fiance(e) of a U.S. citizen whom I married within 90 days of entry, or I am the K-2 child of such a fiance(e) [Attach a copy of the fiance(e) petition approval notice and the marriage certificate.]

d. ☐ I was granted asylum or derivative asylum status as the spouse or child of a person granted asylum and am eligible for adjustment.

e. ☐ I am a native or citizen of Cuba admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least one year.

f. ☐ I am the husband, wife, or minor unmarried child of a Cuban described in (e), and am residing with that person, and was admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least on year.

g. ☐ I have continuously resided in the U.S. since before January 1, 1972.

h. ☐ Other basis of eligibility. Explain. (If additional space is needed, use a separate piece of paper.)

I am already a permanent resident and am applying to have the date I was granted permanent residence adjusted to the date I originally arrived in the U.S. as a nonimmigrant or parolee, or as of May 2, 1964, whichever date is later, and:   *(Check one)*

i. ☐ I am a native or citizen of Cuba and meet the description in (e), above.

j. ☐ I am the husband, wife or minor unmarried child of a Cuban, and meet the description in (f), above.

**Section of Law**
- ☐ Sec. 209(b), INA
- ☐ Sec. 13, Act of 9/11/57
- ☐ Sec. 245, INA
- ☐ Sec. 249, INA
- ☐ Sec. 1 Act of 11/2/66
- ☐ Sec. 2 Act of 11/2/66
- ☐ Other

**Country Chargeable**

**Eligibility Under Sec. 245**
- ☐ Approved Visa Petition
- ☐ Dependent of Principal Alien
- ☐ Special Immigrant
- ☐ Other

**Preference**

**Action Block**

**To Be Completed by Attorney or Representative, if any**
☑ Fill in box if G-28 is attached to represent the applicant
VOLAG#
ATTY State License #   **MA #380835**

Form I-485 (Rev. 02/07/00)N Page 1

## Part 3. Processing Information

**A.** City/Town/Village of Birth _Muzinge_

Current occupation _None_

Your mother's first name _Joguret_

Your father's first name _Francis_

Give your name exactly how it appears on your Arrival/Departure Record (Form I-94)

_Margret Bukenya_

Place of last entry into the U.S. (City/State)

In what status did you last enter?   *(Visitor, Student, exchange alien, crewman, temporary worker, without inspection, etc.)*

_B - 2_

Were you inspected by a U.S. Immigration Officer?   ☐ Yes   ☐ No

Nonimmigrant Visa Number   _344 89071_

Consulate where Visa was issued   _Kampala_

Date Visa was issued (month/day/year)   _5/31/2000_     Sex:  ☐ Male  ☒ Female

Marital Status   ☐ Married   ☒ Single   ☐ Divorced   ☐ Widowed

Have you ever before applied for permanent resident status in the U.S.?   ☒ No   ☐ Yes If you checked "Yes," give date and place of filing and final disposition.

**B.** List your present husband/wife, all of your sons and daughters (if you have none, write "none". If additional space is needed, use separate paper).

| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
|---|---|---|---|
| _None_ | | | |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| | | | |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| | | | |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| | | | |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| | | | |
| Country of Birth | Relationship | A # | Applying with you?  ☐ Yes  ☐ No |

**C.** List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in other places since your 16th birthday. Include any foreign military service in this part. If none, write "none". Include the name(s) of organization(s), location(s), dates of membership from and to, and the nature of the organization(s). If additional space is needed, use a separate piece of paper.

_None_

## Part 3. Processing Information    *(Continued)*

Please answer the following questions. (If your answer is "Yes" on any one of these questions, explain on a separate piece of paper. Answering "Yes" does not necessarily mean that you are not entitled to register for permanent residence or adjust status).

1. Have you ever, in or outside the U.S.:
   a. knowingly committed any crime of moral turpitude or a drug-related offense for which you have not been arrested? ☐ Yes ☒ No
   b. been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations? ☐ Yes ☒ No
   c. been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action? ☐ Yes ☒ No
   d. exercised diplomatic immunity to avoid prosecution for a criminal offense in the U.S.? ☐ Yes ☒ No

2. Have you received public assistance in the U.S. from any source, including the U.S. government or any state, county, city, or municipality (other than emergency medical treatment), or are you likely to receive public assistance in the future? ☒ Yes ☐ No

   *Child in DSS custody.*

3. Have you ever:
   a. within the past 10 years been a prostitute or procured anyone for prostitution, or intend to engage in such activities in the future? ☐ Yes ☒ No
   b. engaged in any unlawful commercialized vice, including, but not limited to, illegal gambling? ☐ Yes ☒ No
   c. knowingly encouraged, induced, assisted, abetted or aided any alien to try to enter the U.S. illegally? ☐ Yes ☒ No
   d. illicitly trafficked in any controlled substance, or knowingly assisted, abetted or colluded in the illicit trafficking of any controlled substance? ☐ Yes ☒ No

4. Have you ever engaged in, conspired to engage in, or do you intend to engage in, or have you ever solicited membership or funds for, or have you through any means ever assisted or provided any type of material support to, any person or organization that has ever engaged or conspired to engage, in sabotage, kidnapping, political assassination, hijacking, or any other form of terrorist activity? ☐ Yes ☒ No

5. Do you intend to engage in the U.S. in:
   a. espionage? ☐ Yes ☒ No
   b. any activity a purpose of which is opposition to, or the control or overthrow of, the Government of the United States, by force, violence or other unlawful means? ☐ Yes ☒ No
   c. any activity to violate or evade any law prohibiting the export from the United States of goods, technology or sensitive information? ☐ Yes ☒ No

6. Have you ever been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party? ☐ Yes ☒ No

7. Did you, during the period March 23, 1933 to May 8, 1945, in association with either the Nazi Government of Germany or any organization or government associated or allied with the Nazi Government of Germany, ever order, incite, assist or otherwise participate in the persecution of any person because of race, religion, national origin or political opinion? ☐ Yes ☒ No

8. Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion? ☐ Yes ☒ No

9. Have you ever been deported from the U.S., or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings? ☐ Yes ☒ No

10. Are you under a final order of civil penalty for violating section 274C of the Immigration Act for use of fraudulent documents or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit? ☐ Yes ☒ No

11. Have you ever left the U.S. to avoid being drafted into the U.S. Armed Forces? ☐ Yes ☒ No

12. Have you ever been a J nonimmigrant exchange visitor who was subject to the two-year foreign residence requirement and not yet complied with that requirement or obtained a waiver? ☐ Yes ☒ No

13. Are you now withholding custody of a U.S. Citizen child outside the U.S. from a person granted custody of the child? ☐ Yes ☒ No

14. Do you plan to practice polygamy in the U.S.? ☐ Yes ☒ No

**Part 4. Signature.** *(Read the information on penalties in the instructions before completing this section. You must file this application while in the United States.)*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it is all true and correct. I authorize the release of any information from my records which the INS needs to determine eligibility for the benefit I am seeking.

**Selective Service Registration. The following applies to you if you are a man at least 18 years old, but not yet 26 years old, who is required to register with the Selective Service System:** I understand that my filing this adjustment of status application with the Immigration and Naturalization Service authorizes the INS to provide certain registration information to the Selective Service System in accordance with the Military Selective Service Act. Upon INS acceptance of my application, I authorize INS to transmit to the Selective Service System my name, current address, Social Security number, date of birth and the date I filed the application for the purpose of recording my Selective Service registration as of the filing date. If, however, the INS does not accept my application, I further understand that, if so required, I am responsible for registering with the Selective Service by other means, provided I have not yet reached age 26.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| X *Margaret Bukenya* | | | |

*Please Note:*   *If you do not completely fill out this form, or fail to submit required documents listed in the instructions, you may not be found eligible for the requested document and this application may be denied.*

**Part 5.  Signature of person preparing form if other than above.**     *(Sign Below)*

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| *(signature)* | Maureen O'Sullivan | 10/30/02 | 617-482-4500 |

| Firm Name and Address | Kaplan, O'Sullivan & Friedman |
|---|---|
| | 10 Winthrop Square- 3rd Floor, Boston, MA 02110 |

U.S. Department of Justice

Immigration and Naturalization Service

FORM G-325A

**BIOGRAPHIC INFORMATION**

OMB No. 1115-0066

Approval expires 4-30-85

| (Family name) Bukenya | (First name) Marg | (Middle name) N. | ☐ MALE ☑ FEMALE | BIRTHDATE (Mo.-Day-Yr.) 8/15/86 | NATIONALITY Ugandan | FILE NUMBER A- |
|---|---|---|---|---|---|---|

ALL OTHER NAMES USED (Including names by previous marriages)  None

CITY AND COUNTRY OF BIRTH (If known)  Uganda

SOCIAL SECURITY NO. (If any)

|  | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|
| FATHER | Bukenya | Francis | Deceased |  |
| MOTHER (Maiden name) | Namugenyi | Joquret | Deceased |  |

HUSBAND (If none, so state) OR WIFE

| FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|
| N/A |  |  |  |  |  |

FORMER HUSBANDS OR WIVES (If none, so state)

| FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| N/A |  |  |  |  |

APPLICANT'S RESIDENCE LAST FIVE YEARS. LIST PRESENT ADDRESS FIRST.

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 34 Charles St. | Framingham | Massachusetts | USA | 02 | 02 | PRESENT TIME | |
| 100 "A" Street | Framingham | Massachusetts | USA | 04 | 01 | 02 | 02 |
| 14 Greenview Street | Framingham | Massachusetts | USA | 09 | 00 | 04 | 01 |
|  | NYC | NY | USA | 07 | 00 | 09 | 00 |
|  | Denver | Colorado | USA | 06 | 00 | 07 | 00 |
|  | N tinda | Uganda | | 08 | 86 | 06 | 00 |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
|  |  |  | Uganda | 8 | 86 | 06 | 00 |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE.) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|
| None |  |  |  | PRESENT TIME | |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

*Show below last occupation abroad if not shown above. (Include all information requested above.)*

THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR:
☐ NATURALIZATION
☑ STATUS AS PERMANENT RESIDENT
☐ OTHER (SPECIFY)

Are all copies legible?  ☐ Yes

SIGNATURE OF APPLICANT

X Margaret Bukenya

DATE

IF YOUR NATIVE ALPHABET IS IN OTHER THAN ROMAN LETTERS WRITE YOUR NAME IN YOUR NATIVE ALPHABET IN THIS SPACE:

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT:

BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|

(OTHER AGENCY USE)

INS USE (Office of Origin)

OFFICE CODE:
TYPE OF CASE:
DATE:

Form G-325 A (Rev. 10-1-82)          (4) Consul

**U. S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0163

## Application for Employment Authorization

### Do Not Write in This Block

| Remarks | Action Stamp | Fee Stamp |
|---|---|---|
| A# | | |
| Applicant is filing under §274a.12 _____ | | |

☐ Application Approved. Employment Authorized / Extended (Circle one)   until _____ (Date).

Subject to the following conditions: _____ (Date).

☐ Application Denied.
  ☐ Failed to establish eligibility under 8 CFR 274a.12(a) or (c).
  ☐ Failed to establish economic necessity as required in 8 CFR 274a.12(c) (14), (18) and 8 CFR 214.2(f)

I am applying for:   ☒ Permission to accept employment
  ☐ Replacement  (of lost employment authorization document)
  ☐ Renewal of my permission to accept employment  (attach previous employment authorization document)

1. Name (Family Name in CAPS)  (First)  (Middle)
*Bukenya Margret*

2. Other Names Used (Include Maiden Name)
*Nabukenya*

3. Address in the United States  (Number and Street)  (Apt. Number)
*34 Charles St,*
(Town or City)  (State/Country)  (ZIP Code)
*Framingham,  MA  01702*

4. Country of Citizenship/Nationality
*Uganda*

5. Place of Birth (Town or City)  (State/Province)  (Country)
*Muzinge  Uganda*

6. Date of Birth (Month/Day/Year)  7. Sex
*11 8 15 86*   ☐ Male  ☒ Female

8. Marital Status   ☐ Married  ☒ Single
   ☐ Widowed  ☐ Divorced

9. Social Security Number (Include all Numbers you have ever used)
*None*

10. Alien Registration Number (A-Number) or I-94 Number (if any)
*324 729 121 08*

11. Have you ever before applied for employment authorization from INS?
☐ Yes  (if yes, complete below)  ☒ No
Which INS office?  Date(s)

Results (Granted or Denied - attach all documentation)
*N/A*

12. Date of Last Entry into the U.S. (Month/Day/Year)
*6 21 00*

13. Place of Last Entry into the U.S.
*Denver, Colorado*

14. Manner of Last Entry (Visitor, Student, etc.)
*B-2 Visitor visa*

15. Current Immigration Status (Visitor, Student, etc.)
*Pending Adjustment Applicant*

16. Go to Part 2 of the instructions, Eligibility Categories. In the space below, place the letter and number of the category you selected from the instructions (For example, (a)(8), (c)(17)(iii), etc.)

Eligibility under 8 CFR 274a.12
( *C* ) ( *e* ) ( *9* )

### Certification

**Your Certification:**  I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking. I have read the instructions in Part 2 and have identified the appropriate eligibility category in Block 16.

| Signature | Telephone Number | Date |
|---|---|---|
| *Margaret Bukenya.* | | |

**Signature of Person Preparing Form if Other Than Above:**  I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

| Print Name | Address | Signature | Date |
|---|---|---|---|
| | | | |

| Initial Receipt | Resubmitted | Relocated | | Completed | | | |
|---|---|---|---|---|---|---|---|
| | | Rec'd | Sent | Approved | Denied | Returned | |
| | | | | | | | |

Form I-765 (Rev. 04/28 00)Y





## FIRST TERM MONTHLY RESULTS

| MONTH | Eng | Math | Sci | R.E | SST | Read | Write | Vern | A/Cr | Mus | R.E | TOT | Pos |
|-------|-----|------|-----|-----|-----|------|-------|------|------|-----|-----|-----|-----|
| Jan. | | | | | | | | | | | | | |
| Feb. | | 10 | 03 | | | | | | | | | 03 | 3 |
| March | 21 | 21 | 22 | | | | | | | | | 02 | 2 |
| April | | | | | | | | | | | | | |

### 1ST TERM

**1st Term Starts** ........ **Ends** 7/5/99
**1st Term Position** 64 **Out of** 75

| Subject | Full Mark | Marks Gained | Agg. | Remarks | Sign |
|---------|-----------|--------------|------|---------|------|
| English | 100 | 22 | 9 | Weak | M.G |
| Maths | 100 | 20 | 9 | Weak | R.M.K |
| SST | 100 | 22 | 9 | Weak | M.G |
| Science | 100 | 11 | 9 | V.Weak | M.Y |
| Religious Educ. | | | | | |
| Reading | | | | | |
| Handwriting | | | | | |
| Vernacular | | | | | |
| Music | | | | | |
| P.E | | | | | |
| Art/Craft | | | | | |
| **TOTAL** | 400 | 075 | 36 | NV.U | |

**General Remarks** Below standard

**Class Teacher's Report** Pub. in extra ...
change.

**Headmaster's** ... NINDA PRIMARY SCHOOL
P.O.BOX. 41. NYANCL
**DATE** ....

Information of next Term
Bring 2 T.P. rolls 2 brooms.
I have received, read & understood my child's report.
................ **Parent/Guardian**
N.B. Return this report on the first day of each Term

## SECOND TERM MONTHLY RESULTS

| MONTH | Eng | Math | Sci | R.E | SST | Read | Write | Vern | A/Cr | Mus | R.E | TOT | Pos |
|-------|-----|------|-----|-----|-----|------|-------|------|------|-----|-----|-----|-----|
| May | 43 | 24 | 14 | | 60 | | | | | | | 091 | 01 |
| June | 30 | 23 | 14 | | 10 | | | | | | | 070 | 01 |
| July | 23 | 14 | 20 | | 12 | | | | | | | 083 | 04 |
| Aug. | | | | | | | | | | | | | |

### 2ND TERM

**2nd Term Starts** 1/6/99 **Ends** 26/8/99
**2nd Term Position** 47 **Out of** 73

| Subject | Full Mark | Marks Gained | Agg. | Remarks | Sign |
|---------|-----------|--------------|------|---------|------|
| English | 100 | 42 | 7 | Fair | M.G |
| Maths | 100 | 16 | 9 | Weak | R.M.K |
| SST | 100 | 25 | 9 | Weak | M.G |
| Science | 100 | 24 | 9 | Weak | M.Y |
| Religious Educ. | | | | | |
| Reading | | | | | |
| Handwriting | | | | | |
| Vernacular | | | | | |
| Music | | | | | |
| P.E | | | | | |
| Art/Craft | | | | | |
| **TOTAL** | 400 | 107 | 34 | DIV. U | |

**General Remarks** Still weak

**Class Teacher's Report** A little improvement.
Aim higher. change.

**Headmaster's Report** NINDA PRIMARY SCHOOL
P.O.BOX. 41 NYANCL
**DATE**

Information of next Term
Bring 2 T.P. rolls 2 brooms.
I have received, read & understood my child's report.
................ **Parent/Guardian**
N.B. Return this report on the first day of each Term

## THIRD TERM MONTHLY RESULTS

| MONTH | Eng | Math | Sci | R.E | SST | Read | Write | Vern | A/Cr | Mus | R.E | TOT | Pos |
|-------|-----|------|-----|-----|-----|------|-------|------|------|-----|-----|-----|-----|
| Sept. | | | | | | | | | | | | | |
| Oct. | | | | | | | | | | | | | |
| Nov. | | | | | | | | | | | | | |
| Dec. | | | | | | | | | | | | | |

### 3RD TERM

**3rd Term Starts** 20/9/99 **Ends** ........ **Out of** 71
**3rd Term Position** 53

| Subject | Full Mark | Marks Gained | Agg. | Remarks | Sign |
|---------|-----------|--------------|------|---------|------|
| English | 100 | 41 | 7 | Fair | M.G |
| Maths | 100 | 17 | 9 | Weak | |
| SST | 100 | 30 | 8 | Pull up | M.G |
| Science | 100 | 30 | 8 | Pull up | M.Y |
| Religious Educ. | | | | | |
| Reading | | | | | |
| Handwriting | | | | | |
| Vernacular | | | | | |
| Music | | | | | |
| P.E | | | | | |
| Art/Craft | | | | | |
| **TOTAL** | 400 | 118 | 32 | DIV.4 | |

**General Remarks** Weak.

**Class Teacher's Report** Promoted to P.6.
on trial. change.

**Headmaster's Report** ... effort ...
this ...

Information of next Term
Bring 2 T.P. rolls 2 brooms.
I have received, read & understood my child's report.
................ **Parent/Guardian**
N.B. Return this report on the first day of each Term
Reporting date; 7/2/2000

Case 1:05-cv-10943-DPW   Document 1-2   Filed 05/06/2005   Page 19 of 24

Margret Bukenya   #515   GRADE 09   HR: C105

05-21-2002

**PARENT/GUARDIAN NAME AND ADDRESS**
Sara Rivera - Foster Parent
34 Charles St
Framingham, MA 01702

## Framingham High School
A Street, Framingham, MA 01701-4195
(508) 620-4963
FAX (508) 877-6603
TTY (508) 877-3268

**MESSAGE**

| Levels | | | Weight |
|---|---|---|---|
| AP | = | Advanced Placement | 20 |
| Hon | = | Honors | 19 |
| CP-1 | = | College Preparatory 1 | 18 |
| CP-2 | = | College Preparatory 2 | 17 |
| U | = | Unweighted | 0 |

| SUBJECT | LEV | CRS | 1st | 2nd | 3rd | FINAL | TEACHER |
|---|---|---|---|---|---|---|---|
| MathCP2 | CF2 | 208 | B | C | B- | | nm/Plum; |
| EarthScCP2 | CF2 | 313 | D- | C | B- | | Bruni;S |
| WldStdlCP1 | CP1 | 413 | C | B- | B+ | | Clark;H |
| IntroMusic | U | 660 | C | C- | | C- | Moore;D |
| MusicThue1 | U | 684 | | | B+ | | Sosny;R |
| Fitness | U | 730 | | | A+ | | Freda;S |
| SportsEd | U | 731 | C+ | C+ | | C+ | Sowa;E |
| 3ARdgWkCP2 | CP2 | 820 | B+ | A- | A- | | Jeban;R |
| 3ALitCP1 | CP1 | 821 | A- | B | B+ | | Taintor.M |

| | 01-25-2002 TO 04-05-2002 | YEAR TO 05-21-2002 |
|---|---|---|
| ABSENCES | 0.0 | 1.0 |
| TARDIES | 0.0 | 0.0 |
| DISMISSALS | 0.0 | 3.0 |

# Fuller Middle School
# Framingham Public Schools

**Student: Bukenya, Margret Nabuken...**  Homeroom:  **B07**

Team: ESL8  I.D. No.:  494

### Grade Legend
The following grades represent an evaluation of Margret's performance in terms of his/her ability.

A  Does consistently excellent work
B  Maintains high performance level
C  Performs at acceptable level
D  Meets minimum requirements
F  Does not meet minimum requirements
I  Incomplete      P  Passing

| Attendance Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Trimester 1 | | Trimester 2 | | Trimester 3 | | Year to Date | |
| A | T | A | T | A | T | A | T |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| Course Name | Section | Teacher | Trimester 1 | Trimester 2 | Trimester 3 | Final Grade | Comments |
|---|---|---|---|---|---|---|---|
| Study Skills | 4 | Cross, Caitlin | B | B+ | | | Margret is a pleasure to have in class. Margret works well with others. Margret participates well orally. |
| ESL III | 1 | Quinlan, Megan | | B- | | | Margret is a pleasure to have in class. Excellent effort! |
| NAT LANG | 7 | Benyo, Pat | C+ | B | | | Margret is a pleasure to have in class. |
| NAT LANG | 8 | Benyo, Pat | C+ | | | | |
| Math ESL | 1 | Walsh, Virginia | C | C | | | Margret needs to come for extra help after school. |
| Sci ESL | 1 | Quinlan, Megan | | | | | New Student, too soon to grade. |
| Art | 81 | Campbell, Nancy | B | | | | |
| Health | 81 | Littleton, Linda | | A- | | | Your daughter is a pleasure to teach. |
| PE | 81 | Bingham, Cynthia | B | | | | |
| Music    Chor | 81 | Fazio, Louis | P | A- | | | Margret is a pleasure to have in class. Your daughter is a pleasure to teach. |
| Tech Ed | 81 | Allain, Louise | | | | | |
| FCS | 81 | Shagory, Andrea | | P | | | Margret's grade reflects a modified program. Excellent effort! |

Date printed:  Tue, MAR 20, 2001

07/02/0    TUE 08:11    [TX/RX NO 81891]    ☒002

**STUDENT** : **Bukenya; Margret**                    ID# : 09515

PAR/GUAR : Sara Rivera - Foster Parent
ADDRESS : 34 Charles St
CITY : Framingham                STATE : MA    ZIP : 01702
PHONE : (508)875-0534            SEX : F    DOB : 08-15-1986
YEAR/GRAD : 2005                 DATE GRADUATED

| GR:YEAR | # COURSE | LEV | ABS | FNL | CREDIT |
|---------|----------|-----|-----|-----|--------|
| | TOTAL CREDITS: | | | | 0.00 |

MEMB: 0    ABS: 0    TAR: 0    DIS: 0

| GR:YEAR | # COURSE | LEV | ABS | FNL | CREDIT |
|---------|----------|-----|-----|-----|--------|
| | TOTAL CREDITS: | | | | 0.00 |

MEMB: 0    ABS: 0    TAR: 0    DIS: 0

| GR:YEAR | # COURSE | LEV | ABS | FNL | CREDIT |
|---------|----------|-----|-----|-----|--------|
| | TOTAL CREDITS: | | | | 0.00 |

MEMB: 0    ABS: 0    TAR: 0    DIS: 0

| GR:YEAR | # COURSE | LEV | ABS | FNL | CREDIT |
|---------|----------|-----|-----|-----|--------|
| 09-01-02 | 208 Math1CP2 | CP2 | 0 | C+ | 1.00 |
| 09-01-02 | 313 EarthScCP2 | CP2 | 0 | C+ | 1.00 |
| 09-01-02 | 413 WldSt3:CP1 | CP1 | 0 | C- | 1.00 |
| 09-01-02 | 660 IntroMusic | U | 0 | C- | 0.50 |
| 09-01-02 | 694 MusicThtr1 | U | 0 | B- | 0.50 |
| 09-01-02 | 730 Fitness | U | 0 | A- | 0.50 |
| 09-01-02 | 73: SportsEd | J | 0 | C+ | 0.50 |
| 09-01-02 | 820 3ARdg'rCP2 | CP2 | 1 | B+ | 1.00 |
| 09-01-02 | 821 3RLitCP1 | CP1 | 1 | B | 1.00 |
| | TOTAL CREDITS: | | | | 7.00 |

MEMB: 180    ABS: 1 9    TAR: 5    DIS: 4

ACADEMIC STANDING
AT END OF

| | PERCENTILE | GPA | QUL.PT | WT |
|---|-----------|-----|--------|-----|
| | 0.00 | 0.00 | 0.00 | 0.00 |

NUMBER OF CREDITS EARNED IN THIS SCHOOL

| | | | | | | | | TOTAL CREDITS |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 0.00 |

| English | World Lang | Math | Science | History/SS | Business | FCS/FArts | PESPED | ESL | Misc | TOTAL |
|---------|-----------|------|---------|-----------|----------|-----------|--------|-----|------|-------|
| 0.00 | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 1.00 | 1.00 | 2.00 | 1.00 | .00 |

DATE PRINTED  07-02-2002

CONFIDENTIAL

**ATTENTION!**

DO  NOT  OPEN

**FOR  INS ONLY**

CONFIDENTIAL

**Sanjeev Sharma, M.D., P.C.**
d/b/a NEWTON-WELLESLY FAMILY PRACTICE
U.S. Civil Surgeon
28 Worchester Road
Framingham, Massachusetts 01702-5508

U.S. Department of Justice
INS     JFK Building
Government Center
Boston, MA  02203

CONFIDENTIAL

*Affidavit from DSS Social Worker*



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Social Services

### Framingham/Marlboro Area Office
63 Fountain St., Framingham, Massachusetts 01702
Phone: (508) 424-0100 ◆ Fax: (508) 872-8340

ARGEO PAUL CELLUCCI
Governor
◆
JANE SWIFT
Lieutenant Governor
◆
WILLIAM D. O'LEARY
Secretary
◆
JEFFREY A. LOCKE
Commissioner
◆
JUDY ABRAHAMS
Area Director

July 19, 2001

AFFIDAVIT

Child:   Margret Bukenya, DOB 08/15/1987
100 A Street
Framingham, MA 01702
508-877-4831

Father:   Deceased

Mother:   Deceased

I, Doreen Woodside, upon information and belief, take oath and say:

1. I am employed with the Department of Social Services (DSS). The office is located at 63 Fountain Street, Framingham, MA 01702. I am the assessment worker for Margret Bukenya.
2. This child first became known to DSS on March 27, 2001 when a voluntary application was received, reporting past physical abuse of Margret in her native country of Uganda.
3. Margret was born and raised in Uganda. Her parents died of terminal illness. Margret does not remember how old she was when her parents died. Margret lived with various paternal relatives. Margret reports that she was severely physically and emotionally abused in the care of her paternal uncle and his wife.
4. Margret recently disclosed sexual abuse by her paternal uncle with whom she lived.
5. In June of 2000, Margret received assistance from her Ugandan school counselor and another paternal uncle to fly to the United States for a singing competition in Colorado.
6. Margret arrived in the U.S. on June 19, 2000. Margret arrived with passport, birth certificate and immunization paperwork. The information in this paperwork may not be accurate. A woman from Uganda who now lives in the U.S met her. This woman, Jane (last name unknown) introduced Margret to the Ssentongo family in Framingham, MA. Margret participated in the singing competition and then moved to Framingham in July 2000.
7. Margret lived with Elizabeth Ssentongo and her family (Michael Katende, Kyle Katamba and Khloe Nakiryowa) from July 2000 to April 2001. Ms. Ssentongo could no longer care for Margret and her own family combined. Ms. Ssentongo shared persuasively with DSS that while Margret lived with them, she struggled extensively with memories of her Uganda history.

8. Ms. Ssentongo applied for voluntary services to help Margret obtain a safe place to live and to assist her with her issues around the alleged physical, emotional and sexual abuse.

9. Margret went to live with the Andreazi family of Framingham, where she currently resides. Luciana and Percy Andreazi reside at 100 A Street with their three children, Fernando age 16, Joe age 15 and Marina age 13. The Andreazi family has agreed to be a foster placement for Margret and are involved in the DSS home study process.

For all of these reasons numerated above,

1. The Department believes that the child is at risk of physical abuse and/or neglect by her paternal uncle and his wife in Uganda;
2. The child returning to Uganda is contrary to the welfare of the child.
3. The Department has made reasonable efforts to find the child a permanent foster home.

Signed under the pains and penalties of perjury this nineteenth day of July 2001.

Doreen A Woodside

Doreen A. Woodside
Social Worker, Department of Social Services

# EXHIBIT B

Packet of additional supporting
documents delivered to
Defendants on
December 18, 2003

## KAPLAN, O'SULLIVAN & FRIEDMAN, LLP
### ATTORNEYS AT LAW

TEN WINTHROP SQUARE • THIRD FLOOR   BOSTON, MASSACHUSETTS 02110

HARVEY KAPLAN
MAUREEN O'SULLIVAN
JEREMIAH FRIEDMAN

(617) 482-4500
FAX: (617) 451-6826

December 18, 2003

JFK Federal Building
Immigration and Naturalization, Room I-140
Government Center
Boston, Massachusetts 02203

Re:    **APPLICATION TO ADJUST TO PERMANENT RESIDENCE STATUS**
       **Margaret NABUKENYA**
       **A # 79 679 221**

Dear Officer:

I continue to represent Ms. Bukenya regarding her application for permanent residence status. We believe the enclosed birth certificate is Margaret's true birth certificate.

In response to your request for additional information we are submitting the following documentation:

1.    Initial Court Investigation from the Framingham Juvenile Court. This report clearly outlines the abuse and neglect this child has endured.

2.    Margaret's true  birth certificate from Uganda.

3.    Authentic death certificate of Francis Bukenya, the father of Margaret Bukenya.

4.    Death certificate of Margaret's mother. This certificate contains her official name, rather than her tribal name which she generally used.

Kindly approve this case as soon possible. Thank you very much.

Sincerely,

Maureen O'Sullivan

STEPHEN SCHNEIDER
COURT INVESTIGATOR
(617) 576-9789



September 28, 2001


Framingham Juvenile Court
Care and Protection Docket No. CP0149023


MARGRET BUKENYA


COURT INVESTIGATION


THE FAMILY


Francis Bukenya, deceased, the father.
Juliet Namugenia, deceased, the mother.
Margret Bukenya, born 8/15/87, the child.

Margret is from Uganda.  Her parents both reportedly died of
AIDS in Uganda.  Margret resides in Framingham in a DSS foster
home.


DSS: RECORDS AND INTERVIEWS


THE AFFIDAVIT


DSS social worker and Assessment social worker, Doreen Woodside,
filed a Care and Protection Petition, and an Affidavit dated
July 19, 2001.

Doreen stated that Margret came to the attention of DSS when

1

the family caring for her requested a voluntary placement.
Reportedly, Margret had been severely emotionally and physically
and sexually abused in Uganda by a paternal uncle and aunt after
her parents died.  Margret came to the United States on a student
visa after a teacher and another uncle arranged for her to travel
to Littleton, Colorado, for a singing competition in June, 2000.
Margret arrived with a passport, birth certificate, and
immunization documents, which might have been altered to allow
her to leave Uganda.  After the competition, a woman from Uganda
who lived in New York, Jane [Nomukasa], assisted her to move
to New York and then to Framingham to live with the Ssentongo
family.  She arrived in Framingham in July, 2000, and remained
with Elizabeth Ssentongo and Mike Katende until April, 2001.
As they had children of their own, they found they could not
care for Margret, who was having bad memories of her abuse in
Uganda, and they requested a voluntary DSS placement.  Margret
was placed with Luciana and Percy Andreazi [a Brazilian family]
in Framingham, and their 3 children, Fernando, 16, Joe, 15,
and Marina, 13.


                    THE 51A REPORT


A 51A report was filed April 2, 2001 by a non-mandated reporter.
This was in essence an application for voluntary services by
the child's caretaker, Elizabeth.  It was noted that Margret
had never been tested for AIDS.  It was noted by the caretaker
that in Uganda with her uncle and aunt, Margret would be denied
food if she forgot to take the goats to pasture to eat.  She
would be beaten too.  She may have been required to sleep with
the goats.  If she spilled food on the floor when she was serving
dinner, she would have to eat it off the floor.  She reported
that Margret was having nightmares.  She was terrified to even
talk about Africa.  It was noted that Margret was here on an
expired tourist visa.  She spoke English and Baganda and was
from the Lugansa Nation.  Elizabeth reported that in Africa
there is no DSS, and people are allowed to treat children as
they wish.  She said if Margret returned to Africa, she faced
punishment for running away from her uncle.

Luciana is a Framingham school counselor and she came forward
to request that Margret be placed with her family.  She said
that Margret had reported to her that she had lived with her
paternal uncle and aunt for 4-5 years.  She reported that the
birth certificate is fake, listing her uncle and aunt as her
parents.  The immunization documents also appeared fake.  The
birth date on one document was 8/15/86, but Margret was certain
her birth date is 8/15/87.  The documents may have altered to
help her leave Uganda.

Margret reported to Doreen that her uncle and aunt had 6 children
but made her do all the work.  She said her Uncle Matov, a good

                              2

uncle, helped her with the paperwork to leave Uganda. Margret reported that her aunt beat her with a stick on a daily basis, often as a way of awakening her in the morning.

## THE DSS ASSESSMENT

Doreen Woodside did the 2001 Assessment. Margret reported that her parents weren't married. She said she lived with her mother as a young child and then lived with her father's extended family. He was married to another woman, and they had 4 children. Her mother never returned for her. Her father died when she was 8 and later her mother died when she was 11. She initially lived then with maternal relatives and then with her paternal uncle and aunt. She said she was badly abused by them and has just now stopped having mightmares. Margret had just completed 8th grade at the Fuller Middle School in Framingham. Luciana was a school psychologist at the Fuller Middle School. Percy, her husband, is a health administrator at Wayside.

## DOREEN WOODSIDE

Doreen said that she was frustrated during the Assessment by having only Margret'a account of events in Uganda, although she noted that she found Margret credible, genuine, and enjoyable. She said Margret was placed with a wonderful foster family with great children. She said Margret has symptoms of PTSD and lives in fear of being returned to Uganda.

## DOREEN BROOKS

Doreen Brooks is the ongoing social worker. She said the goal is long term foster care with independent living skill training when she turns 16. She said Margret is being referred for therapy. She said Margret seems sad. She said she has settled in well in her foster home, although at times she withdraws emotionally. She said, "She's a survivor and needs to learn how to open up to family support. She shuts down at times." Doreen said she also was hiding her homework from Luciana although this has started to change. It is assumed that she was struggling with her school work, in part due to gaps in her learning and English language difficulties. Doreen said once her mid term grades are out, she will know better if she needs special educational services.

Doreen said Margret recently had a physical and was found to be healthy, although she was having a pain in her leg and did have a scar there. She has reported she has been hit by a board

with a nail in it in Uganda.  Doreen thought there might be
an internal infection and said she would have this further
evaluated.


## DIANE CURRAN


Diane is a DSS attorney in the Central Legal office of DSS in
Boston.  She said she had not yet received the referral yet
to assist Margret with her immigration status and her effort
to obtain a green card.  She said if Margret can document her
abuse in Africa and the likelihood that it would continue if
she was returned, it wis possible she would be allowed to stay
in the United States.  Diane said it is a lengthy process, taking
generally at least a year.


## FRANCIS BUKENYA: RECORDS AND INTERVIEWS


## FRANCIS BUKENYA


Francis is reportedly deceased.


## JULIET NAMUGENIA: RECORDS AND INTERVIEWS


## JULIET NAMUGENIA


Juliet is reportedly deceased.


## MARGRET BUKENYA: RECORDS AND INTERVIEWS


## LUCIANA'S ACCOUNT


Luciana Andreazi, from conversation with Margret, wrote DSS
a Memo and noted that Margret, after both of her parents had
died, lived with a maternal aunt, Fiona Geyet, and was then
placed with her paternal uncle, Iga Simon, and his wife.  She
was abused by them.  Margret attended the Ntinda Primary School
in a village 4 miles from her house.  The school was in Kampala,
a city in Uganda.  Her school counselor, Mr. Matof, who helped
AIDS orphans, after hearing of her mistreatment, arranged for
her to travel to the singing competition in Colorado.  She was
met there by a woman named Joa, who arranged to have her move
to New York with a woman named Jane.

4

## THE REPORT CARD

Margret arrived with a 1999 Uganda report card, which indicated that her work in English was fair, and her work in math, social studies, and science was weak.  Her work was generally referred to as "weak."  It was noted that "more effort is needed."  It was also noted that for the next term she was to bring to school with her "2 T.P. rolls, 2 brooms."

## HER FRIEND'S LETTER

Margret's friend, Sylvia Naicitende, wrote her a letter on her behalf from Uganda.  She wrote:

"Margrete was my best friend in Uganda.  She is a girl who does not get anoide...She is not short-tempered...She takes things easy and she loves her friends...She knows what a friend is...But thank God because that girl left the home she was living in because that friend of mine used to suffer a lot.  Since she was staying with her stape mam it became worse.  Some times she use not to eat.  She could sleep hungry and on that she was bitten after working and doing every home and house work... They had goats at home, that lady use to tell her to go and graze those goats the whole day with out eating anything...But if now you can take care of her it's so wonderful...Margret is a complete ophan...She has no mather and either father.  But for me I'm an ophan because my dady died in 1990...thank you for listening greating to Margrete tell her that even though she is not with us we still love her."

## MARGRET'S ESSAY

Margret wrote, "The most beautiful place I have ever seen is America because there is no beting children it has very beautifyl places like Boston Colorado and I love it and I live Boston because it has good schools and its people are kind they can show that they love other peoples and I love Amercia because they is not ware all places are pacfull no fitting no sitting so I want this place to be like this for ever and ever."

## UGANDA

After a year volunteering for Visions In Action, an agency providing volunteers in international development, Margaret

5

Brawley, an American volunteer from Michigan, wrote of her experience working in Kampala as a volunteer in the area of public health [This article was found in the Internet under Kampala, Uganda on Google. This investigator provided a copy to Margret to read during the interview and it appeared to remind her of what she loved about Uganda and she said it made her happy to remember], "...Michigan students are collecting school supplies for the deaf school in Ntinda and the students have begun corresponding back and forth with a pen-pal program [Margret reported that the deaf school was right next door to her primary school]....Uganda is a country filled with welcoming souls- despite the pervasive poverty and poor economic conditions, the people are colourful, cheerful, and full of life. My days are filled with children chorusing mzunga in playful rhythm, tugging at my hands; matatus maneuvering down red dusty roads full of enormous potholes; thatched huts and tin roofs; open-air stores brimming with vegetables, fruits and local meats or fish; days whe the sky opens up the rain door and lets it pour like there has never been rain before; the wake up calls of the Muslim mosque and the roosters; and endless insect humming. When I think of Uganda, I think of children tied securely to their mothers' backs; women casually walking with large baskets of goods on their heads; men gathered at local watering holes to pass the time; bicyles carrying everything from live pigs to large wooden bed frames; the overflow of water with nowhere to go on city streets; mosquito bites; fanatical religious zealots; mob justice; children with pangas; open displayed affection by men....; college graduates unable to find jobs; guarded compounds; car hijackings; living by African time; bombings....overcrowded schools with inadequate supplies and facilities; surprise holidays; the free roam of chickens, goats, and cattle on the streets and in the neighborhoods; children playing in trash dumps overflowing with filth; hospitals with only one thermometer...Uganda represents the underlying tension between people eager for freedom and basic human rights contrasted against a government full of corruption and the never-ending want for power....violence encroaching the periphery of society, always appearing on the outskirts, but causing ripples throughout the inner sanctum of everyday life; and the traditional beliefs of withcraft, family, marriage (i.e. multiple wives) competing against the rush of western moral beliefs. Uganda is the hustle and bustle of Owino market; days when the sun beats down drenching you in sweat; the endless odour and smoke of buring fires from collected trash; the foul smell of a pit latrine dug too shallow; the bargaining, haggling, and negotiation for every little purchase; the constant call of America....manic boda boda drivers [Margret said these are motorcycles]; the non-existence of trash cans and the prevalence of using the earth as one big dumping area; marabou storks canvassing the local trash bins; street children begging for a small sweet or shilling; grasshopper delicacies [Margret was disappointed that Americans did not generally eat grasshoppers which she reported are very tasty];

protector condoms; running blackouts of electricity and water;
chicken on a stick; cold showers; the incessant grime of red
dust pervading your nostrils and skin; the Ugandan tendency
to speak for hours on end at public functions; formal greetings
and lengthy introductions; dancing to African music....and the
eargerness for new celebrations.  This is the Uganda I have
come to know and love."

### ELIZABETH SSENTONGA

Elizabeth is the Ugandan woman who first took Margret into her
home when she arrived from New York.  She was reticent to be
interviewed and just said that Luciana is a good person and
that she trust her to take good care of Margret.

### LINDA JAMES

Linda is a guidance counselor at the Fuller Middle School where
Margret attended 8th grade last year.  She said Margret is "a
great kid, very nice, quiet, well-behaved, and a hard worker."
She said she had difficulty with math.  She said she had a lot
of schooling gaps.  She said she had no absences for the year.
She reviewed her grades, which included a D in ESL math, a D
in science, a B in ESL reading, an A in gym, and an A in music.

### PETRA FARIES

Petra is a guidance counselor at Framingham High School where
Margret now attends 9th grade.  She said she is a sweet and
quiet child, who is in the process of transitioning from ESL
to mainstream classes.

### LUCIANA ANDREAZI

Luciana is Margret's current foster mother.  She said Margret
has been with her for 6 months.  She said she and her husband
have 4 children, a girl 23, no longer in the home, a boy 17,
a boy 16, and a girl, Marina, 13, who is friends with Margret.
She said Margret is very afraid of having to return to Uganda.
She said she is doing well with her and is just starting to
be more open with her.  She said Margret had been hiding her
school work and not sharing it with her.  She said Margret is
now starting to allow her to see and review it.  She said Margret
missed a lot of school in Uganda.  She said Margret had high
expectations of herself at school and then shut down when she

7

was unable to meet her expectations, which resulted in her own
children feeling rejected by her and pulling away from her.
This is improving and Margret has agreed to attend counseling.

Luciana said that due to the abuse she suffered in Uganda, it
is "difficult for her to be happy." She said Margret
was essentially a slave in Uganda and was called an "it," by her
uncle and aunt. She said this uncle also burned her brother
to punish him which was not illegal in Uganda.

Luciana said Margret is a very good singer, and is also
considering attending Keefe Tech next year. She said she has
found a piano teacher for Margret.

## MARGRET BUKENYA

Margret said, after reading the volunteer's account of Uganda,
that she didn't really understand what it is like in Uganda.
"So many children don't have their parents. They live with
others. I don't understand how children are treated in Uganda.
You can go to college but then there are no jobs. Many die
of AIDS, many people. There are so many thieves and street
children. It is hard to get into public school. You have to
pay for school and for supplies. If you don't pay, no school.
You can go to the school, but they won't teach you. In Uganda
when you go to the police to report bad behavior, they won't
help you unless you have money. Everything there is about
money."

"You do argue over every purchase. People gossip and argue.
If you are from another region in Uganda, as my mother was,
people treat you badly. It is good here with Luciana. In
school, English is difficult for me. I may know the answer
but I don't always know how to write it. I do have friends
there. I agree that I need counseling and help with my
immigration stutus."

"It is a miracle, coming here. There was no schooling there.
Where would I have been 5 years from now. I had no one to look
up to or depend on. There, I had to get up early and clean
the goat house and take them their food and then clean the house.
I would have to wash the dishes and then wash them again.
Sometimes I wished to die. I once swallowed a metal piece from
the inside of a watch thinking I would die. I felt dizzy.
I was sick for along time. I will never forget that day. I
had to to work even though I was very sick for along time."

"I have one brother and two sisters in Uganda. My father had
many wives so I may have more brothers and sisters. I never
actually lived with my dad. I lived with many different people.
Sometimes I don't remember it all...so may things happening

at different times.  It is a miracle I am here."

"I miss in Uganda Lake Victoria; I miss friends; I miss the birds and the animals."

"I want to stay here.  I want to sing and take piano classes. I am happy now."

SUMMARY AND RECOMMENDATIONS

This court investigator agrees with the DSS plan of long-term substitute care, hopefully with Luciana.  It is essential that Margret receive counseling to address her history of abuse, and assistance with her immigration status.

Margret has apparently had a difficult life in Uganda.  She is very happy to be in the United States.  Hopefully, her life here will be filled with more positive experiences.  She is a genuine and delightful young woman, with a lot of promise and potential.


Sworn to under pains and penalties of perjury,


Stephen Schneider, M.A., J.D.

KAPLAN, O'SULLIVAN & FRIEDMAN, LLP
ATTORNEYS AT LAW

TEN WINTHROP SQUARE • THIRD FLOOR   BOSTON, MASSACHUSETTS 02110

HARVEY KAPLAN
MAUREEN O'SULLIVAN
JEREMIAH FRIEDMAN

(617) 482-4500
FAX: (617) 451-6826

December 18, 2003

JFK Federal Building
Immigration and Naturalization, Room I-140
Government Center
Boston, Massachusetts 02203

Re:    **APPLICATION TO ADJUST TO PERMANENT RESIDENCE STATUS**
       **Margaret NABUKENYA**
       **A # 79 679 221**

Dear Officer:

I continue to represent Ms. Bukenya regarding her application for permanent residence status. We believe the enclosed birth certificate is Margaret's true birth certificate.

In response to your request for additional information we are submitting the following documentation:

1.    Initial C(
      outlines

2.    Margaret

3.    Authentic

4.    Death cer
      than her t                                              ither

Kindly approve th

Sincerely,

Maureen O'Sullivan

## DEPARTMENT OF HOMELAND SECURITY
## BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

NAME OF BENEFICIARY: Nabukenya, Margret
FILE NO: A079 679 221
FORM NO.  I-485

SEP 2 4 2003

Margret Nabukenya
C/o Dept of Social Service
Attn: Doreen Brooks
63 Fountain Street
Framingham Ma 01702

**PLEASE COMPLY WITH THE BELOW CHECKED ☐ INSTRUCTIONS.  YOU ARE REQUIRED TO SUBMIT THE FOLLOWING INFORMATION WITHIN 12 WEEKS OR YOUR APPICATION MAY BE DENIED.** by 12\03\03

☐ 1. The above application/petition and its supporting documents are attached.
☐ 2. The above application/petition and its supporting documents have been forwarded to your attorney or representative.
☐ 3. Please complete the blocks on your enclosed application/petition, which are checked ☐ in red.
☐ 4. Please follow the instructions on your enclosed application/petition, which are checked ☐ in red.
☐ 5. Furnish the required fee of $_____.
☐ 6. Furnish the birth or baptismal certificate of yourself.
☐ 7. Furnish the marriage certificate of _____
☐ 8. Furnish proof of death or legal termination of marriage of_____.
☐ 9. A foreign document must be accompanied by a translation in English.  The translator must certify that he/she is competent to translate and that the translation is accurate.
☐ 10. Furnish the date and port of each of your entries into the United States and the name of the ship, place, or other vehicle on which you traveled.
☐ 11. Except for aliens with occupations listed under Schedule A, 20 Code of Federal Regulations, Part 656.10, a certification from the Secretary of Labor must be obtained before your petition or application may be resubmitted to this Service.  Further information and Department of Labor forms and instructions may be obtained from the local office of the state employment service agencies.
☐ 12. You have indicated that you do not intend to seek employment.  You must furnish evidence that you have sufficient funds or other means of maintaining yourself in this country.
☐ 13. Furnish two (2) color photographs.  These photos must have a white background, photos must be glossy, un-retouched and not mounted.  Dimension of the facial image should be about 1 inch from chin to top of hair or head shown in 3/4 frontal view of right side of face with right ear visible.  Using soft pencil or felt pen, print name (and alien registration receipt number, if known) on the back of each photograph.  You should show these instructions to the photographer who takes the pictures.
☐ 14. You may now apply for adjustment of status, on the attached forms, for yourself and below listed persons.
☐ 15. Your proof of status documents have been checked and are attached.  Your application/petition is being processed and will be completed in the near future.
☐ 16. You are required to submit a Medical Examination of Aliens Seeking Adjustment to Status (Form I-693) and Supplement to Form I-693 for documentation of immunizations.
☐ 17. A review in the Department of State's Foreign Affairs Manual indicates that death and birth certificates are obtainable from Uganda.  Therefore, please provide the death certificates of your parents and a true birth certificate for Margret Nabukenya.  You claim the birth certificate submitted by you along with your application for permanent residence to be fraudulent.  Therefore please provide a true birth certificate along with the true death certificates of your parents.
☐ 18. Please provide an original letter from the court indicating what documents they reviewed to determine that your parents were deceased.  The letter must indicate in detail how the court found that you have been neglected, abandoned or abused.

☎ CC: OSullivan

Form I-72                    **PLEASE RETURN THIS LETTER AND ALL ATTACHMENTS**
                                    **WITH YOUR RESPONSE**



**DEPARTMENT OF HOMELAND SECURITY**
**Citizenship and Immigration Services**

---

*John Fitzgerald Kennedy Federal Building*
*Government Center*
*Boston, Massachusetts 02203*

*P lease Refer to this file Number:* **A076 679 221**

Dear Applicant,

In order to serve you more efficiently, you are requested to hand deliver the documents requested in person at the following address:

    JFK FEDERAL BUILDING
    IMMIGRATION AND NATURALIZATION  ROOM E-140
    GOVERNMENT CENTER
    BOSTON, MASSACHUSETTS

    BETWEEN THE HOURS OF  8:00am AND 2:30pm
    ANY DAY MONDAY THROUGH FRIDAY
    EXCEPT THE THIRD (3rd) FRIDAY OF EVERY MONTH
    EXCEPT EVERY WEDNESDAY IN JUNE, JULY AND AUGUST 2002
    ROOM E-140 IS CLOSED ON THAT DAY EVERY MONTH

You must bring the form you were given at the interview Form I-72 requesting the additional documents with you and all the items you were asked to submit within the allotted time period. Failure to do so may result in denial of your application.

Sincerely,

Denis C. Riordan
Interim Director
Citizenship and Immigration Services

        CC:

PREPARED BY:..........................
CHECKED BY:...........................
VERIFIED BY:..........................
RECEIPT NO:...........................

# DEPARTMENT OF HOMELAND SECURITY
## BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

SEP 2 4 2003

NAME OF BENEFICIARY: **Nabukenya, Margret**
FILE NO: **A079 679 221**
FORM NO. **I-485**

Margret Nabukenya
C/o Dept of Social Service
Attn: Doreen Brooks
63 Fountain Street
Framingham Ma 01702

**PLEASE COMPLY WITH THE BELOW CHECKED ☒ INSTRUCTIONS. YOU ARE REQUIRED TO SUBMIT THE FOLLOWING INFORMATION WITHIN 12 WEEKS OR YOUR APPICATION MAY BE DENIED.** by 12\23\03

☐ 1. The above application/petition and its supporting documents are attached.
☐ 2. The above application/petition and its supporting documents have been forwarded to your attorney or representative.
☐ 3. Please complete the blocks on enclosed application/petition, which are checked ☐ in red.
☐ 4. Please follow the instructions on your enclosed application/petition, which are checked ☐ in red.
☐ 5. Furnish the required fee of $_____
☐ 6. Furnish the birth or baptismal certificate of yourself.
☐ 7. Furnish the marriage certificate of _____
☐ 8. Furnish proof of death or legal termination of marriage of_____
☐ 9. A foreign document must be accompanied by a translation in English. The translator must certify that he/she is competent to translate and that the translation is accurate.
☐ 10. Furnish the date and port of each of your entries into the United States and the name of the ship, place, or other vehicle on which you traveled.
☐ 11. Except for aliens with occupations listed under Schedule A, 20 Code of Federal Regulations, Part 656.10, a certification from the Secretary of Labor must be obtained before your petition or application may be resubmitted to this Service. Further information and Department of Labor forms and instructions may be obtained from the local office of the state employment service agencies.
☐ 12. You have indicated that you do not intend to seek employment. You must furnish evidence that you have sufficient funds or other means of maintaining yourself in this country.
☐ 13. Furnish two (2) color photographs. These photos must have a white background, photos must be glossy, un-retouched and not mounted. Dimension of the facial image should be about 1 inch from chin to top of hair or head shown in 3/4 frontal view of right side of face with right ear visible. Using soft pencil or felt pen, print name (and alien registration receipt number, if known) on the back of each photograph. You should show these instructions to the photographer who takes the pictures.
☐ 14. You may now apply for adjustment of status, on the attached forms, for yourself and below listed persons.
☐ 15. Your proof of status documents have been checked and are attached. Your application/petition is being processed and will be completed in the near future.
☐ 16. You are required to submit a Medical Examination of Aliens Seeking Adjustment to Status (Form I-693) and Supplement to Form I-693 for documentation of immunizations.
☐ 17. A review in the Department of State's Foreign Affairs Manual indicates that death and birth certificates are obtainable from Uganda. Therefore, please provide the death certificates of your parents and a true birth certificate for Margret Nabukenya. You claim the birth certificate submitted by you along with your application for permanent residence to be fraudulent. Therefore please provide a true birth certificate along with the true death certificates of your parents.
   18. Please provide an original letter from the court indicating what documents they reviewed to determine that your parents were deceased. The letter must indicate in detail how the court found that you have been neglected, abandoned or abused.

CC: O'Sullivan

Form I-72

**PLEASE RETURN THIS LETTER AND ALL ATTACHMENTS
WITH YOUR RESPONSE**

Page ...........

**KAMPALA**    **No.**    **6364**

Death in the Sub-County of ...........**BUMUNGA**........... County of ...........**BUKOTO**........... in the District of ...........**MASAKA**........... Province

f ........................................................................................................ in the Republic of Uganda.

| Date of Death and Time of Death | Place of Death | Name and Surname | Sex | Age | Residence and Occupation | Nationality | Cause of Death | Full Name, Occupation and Residence of Declarant, and in what capacity he gives information | When Registered | Signature of Sub-County Chief |
|---|---|---|---|---|---|---|---|---|---|---|
| 24.8.2000 | MIZINGA MASAKA | CORRETI NAMATE | FEMALE | 34YRS | MIZINGA FARMER. | UGANDAN | NATURAL DEATH | SIMON YIGA TEACHER, MIZINGA, AS BROTHER IN LAW. | 31.7.2003 | SUB-COUNTY CHIEF. |

I, ...........**OYUKO ANTHONY OJOK**........... the Registrar-General of Births and Deaths for Uganda, do hereby certify that this is a true copy of the return/register of deaths for the Birth Registration

District of the Sub-County of ...........**BUMUNGA**........... County of ...........**BUKOTO**........... District of ...........**MASAKA**........... Province of ...........**BUGANDA**........... relating to the death of ...........**CORRETI NAMATE**...........

WITNESS my hand at Kampala this ...........**4TH**........... day of ...........**AUGUST**........... **19**2003

           (DECEASED)

Fee: Shs. 10        **ASST.** Registrar-General of Births and Deaths.



Page ...........

Death in the Sub-County of ...... **BUWUNGA** ........ County of ...... **BUKOTO** ...... in the District of ...... **MASAKA** ...... Province

..... in the Republic of Uganda.

| No. | Date of Death and Time of Death | Place of Death | Name and Surname | Sex | Age | Residence and Occupation | Nationality | Cause of Death | Full Name, Occupation and Residence of Declarant, and in what capacity he gives information | When Registered | Signature of Sub-Registrar or County Chief |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 29 | 6.11.95 | **BUGANDA** **MASAKA** **MIZINGA** | **FRANCIS BUKENYA** | **MALE** | *45*YRS | **MIZINGA** **FARMER.** | **UGANDANS** | **NATURAL** **DEATH** | **SIMON YIGA** **TEACHER,** **MIZINGA, AS BROTHER.** | **24.7.2003** | **SUB- COUN** **CHIEF.** |

I, ....... **OYUKO ANTHONY OUOK** .......... the Registrar-General of Births and Deaths for Uganda, do hereby certify that this is a true copy of the return/register of deaths for the Birth Registration

District of the Sub-County of ...... **BUWUNGA** ...... County of ...... **MASAKA BUKOTO** District of ...... **MASAKA** ...... Province of ...... **BUGANDA** ...... relating to the death of ...... **FRANCIS BUKENY**

WITNESS my hand at Kampala this ...... **4TH** ...... day of ...... **AUGUST** ...... 19~**2003**

**Fee: Shs. 10**

..................... **ASST.**
*Registrar-General of Births and Deaths.*

(SGD)
**OYUKO**
(**DECEASED**)



KAMPALA

A 3 0 2 3 2

Birth in the Sub-County of ......... **MBARARA** ........... County of ......... **KASHARI** ...... in the District of ......... **MBARARA** ......... Province of ......... **WESTERN** ...........
in the Republic of Uganda.

| Date of Birth and Time of Birth | Place of Birth | Name | Sex | Full Name, Residence and Occupation of Father | Full Name and Maiden Name Residence and Occupation of Mother | Nationality of Parents | Full Name, Occupation and Residence of Declarant in what capacity he gives information | When Registered | Signature of Sub-County Chief |
|---|---|---|---|---|---|---|---|---|---|
| 276  15.8.86 | MBARARA | MARGRET NABUKENYA | FEMALE | FRANCIS BUKENYA, MIZINGA, FARMER. | GORRETTI NAKATE BUKENYA, MIZINGA, FARMER. | UGANDANS | SIMON YIGA TEACHER, MTINDA, AS UNCLE. | 23.10.2003  TOWN CLERK | |

I, ..................................... the Registrar-General of Births and Deaths for Uganda, do hereby certify that this is a true copy of the return register of births for the Birth Register

District of the Sub-County of ......... **MBARARA** ........ County of ......... **KASHARI** ........... Province of ......... **WESTERN** ............ relating to the birth of **MARGRET NABUKENYA** D/o

WITNESS my hand at Kampala this .............. **28TH** ............. day of ......... **OCTOBER** ............ 20 **03** .

**FRANCIS BUKENYA**

**Fee: Shs. 200**

**ASST.**

Registrar-General of Births and D......

PREPARED BY:..........................
CHECKED BY:..........................
VERIFIED BY:..........................
RECEIPT NO:..........................

Page.......:.............................

| No. | Date of Birth and Time of Birth | Place of Birth | Name | Sex | Full Name, Residence and Occupation of Father | Full Name and Maiden N... Occupation... |
|-----|---------------------------------|----------------|------|-----|-----------------------------------------------|----------------------------------------|

Birth in the Sub-County of...MASAKA in the Republic of Uganda.

County of......BUKOTO

| No. | Date of Birth and Time of Birth | Place of Birth | Name | Sex | Full Name, Residence and Occupation of Father | Full Name and Maiden N... Occupation... |
|-----|---------------------------------|----------------|------|-----|-----------------------------------------------|----------------------------------------|
| 36 | 15.8.85 | MUZINGE MASAKA | BUKENYA NABUKENYA MARGARET | FEMALE | YIGA SIMON NTINDA, TEACHER. | MUSA... |

I, JOEL COX OJUKO ............................the Registrar-General of Births and Deaths

District of the Sub-County of...MASAKA ............County of......BUKOTO

WITNESS my hand at Kampala this......15TH ......day of........AUGUST

# Fee: Shs. 200

Printed by Uganda Printing and Publishing Corporation

**DEPARTMENT OF HO  ELAND SECURITY**
**Citizenship and Immigration Services**

---

*John Fitzgerald Kennedy Federal Building*
*Government Center*
*Boston, Massachusetts 02203*

*P lease Refer to this file Number*: **A076 679 221**

Dear Applicant,

In order to serve you more efficiently, you are requested to hand deliver the documents requested in person at the following address:

> JFK FEDERAL BUILDING
> IMMIGRATION AND NATURALIZATION  ROOM E-140
> GOVERNMENT CENTER
> BOSTON, MASSACHUSETTS
>
> BETWEEN THE HOURS OF  8:00am AND 2:30pm
> ANY DAY MONDAY THROUGH FRIDAY
> EXCEPT THE THIRD (3rd) FRIDAY OF EVERY MONTH
> EXCEPT EVERY WEDNESDAY IN JUNE, JULY AND AUGUST 2002
> ROOM E-140 IS CLOSED ON THAT DAY EVERY MONTH

You must bring the form you were given at the interview Form I-72 requesting the additional documents with you and all the items you were asked to submit within the allotted time period. Failure to do so may result in denial of your application.

Sincerely,

Denis C. Riordan
Interim Director
Citizenship and Immigration Services

CC:

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

Juvenile Court
Framingham Division
Docket No.0149CP023

\* \* \* \* \* \* \* \* \* \* \* \*

IN RE:
Margret Bukenya

\* \* \* \* \* \* \* \* \* \* \* \*

## ORDER REGARDING MINOR'S ELIGIBILITY
## FOR SPECIAL IMMIGRATION STATUS

Upon the consideration of the testimony and/or documents submitted to date, the Court finds the following:

1. The minor was declared dependent on the Framingham Juvenile Court of the County of Middlesex on January 29, 2002 or was committed to the custody of the Commonwealth on that date due to abuse, neglect or abandonment.

2. On January 29, 2002, the minor was deemed eligible by this Court for long term foster care due to abuse, neglect or abandonment.

3. The Court finds that it is not in the best interest of the minor to be returned to her or her parents' previous country of nationality or the country of last habitual residence, Uganda. It is in the minor's best interest to remain in the United Sates.

An application is to be made to the Immigration and Naturalization Service pursuant to 8 USC Section 1101 (a) (27) (j).

Judge Gail Garinger

. 1/29/02

I HEREBY CERTIFY THAT THIS DOCUMENT
IS A TRUE COPY OF A DOCUMENT FILED
WITH THE OFFICE OF THE CLERK-MAGISTRATE
OF THIS COURT

CLERK-MAGISTRATE



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Social Services
### Framingham/Marlboro Area Office
63 Fountain St., Framingham, Massachusetts 01702

Phone: (508) 424-0100   ◆   Fax: (508) 872-8340

**ARGEO PAUL CELLUCCI**
Governor
◆
**JANE SWIFT**
Lieutenant Governor
◆
**WILLIAM D. O'LEARY**
Secretary
◆
**JEFFREY A. LOCKE**
Commissioner
◆
**JUDY ABRAHAMS**
Area Director

July 19, 2001

AFFIDAVIT

Child:   Margret Bukenya, DOB 08/15/1987
100 A Street
Framingham, MA 01702
508-877-4831

Father:   Deceased

Mother:   Deceased

I, Doreen Woodside, upon information and belief, take oath and say:

1. I am employed with the Department of Social Services (DSS). The office is located at 63 Fountain Street, Framingham, MA 01702. I am the assessment worker for Margret Bukenya.
2. This child first became known to DSS on March 27, 2001 when a voluntary application was received, reporting past physical abuse of Margret in her native country of Uganda.
3. Margret was born and raised in Uganda. Her parents died of terminal illness. Margret does not remember how old she was when her parents died. Margret lived with various paternal relatives. Margret reports that she was severely physically and emotionally abused in the care of her paternal uncle and his wife.
4. Margret recently disclosed sexual abuse by her paternal uncle with whom she lived.
5. In June of 2000, Margret received assistance from her Ugandan school counselor and another paternal uncle to fly to the United States for a singing competition in Colorado.
6. Margret arrived in the U.S. on June 19, 2000. Margret arrived with passport, birth certificate and immunization paperwork. The information in this paperwork may not be accurate. A woman from Uganda who now lives in the U.S met her. This woman, Jane (last name unknown) introduced Margret to the Ssentongo family in Framingham, MA. Margret participated in the singing competition and then moved to Framingham in July 2000.
7. Margret lived with Elizabeth Ssentongo and her family (Michael Katende, Kyle Katamba and Khloe Nakiryowa) from July 2000 to April 2001. Ms. Ssentongo could no longer care for Margret and her own family combined. Ms. Ssentongo shared persuasively with DSS that while Margret lived with them, she struggled extensively with memories of her Uganda history.

8. Ms. Ssentongo applied for voluntary services to help Margret obtain a safe place to live and to assist her with her issues around the alleged physical, emotional and sexual abuse.

9. Margret went to live with the Andreazi family of Framingham, where she currently resides. Luciana and Percy Andreazi reside at 100 A Street with their three children, Fernando age 16, Joe age 15 and Marina age 13. The Andreazi family has agreed to be a foster placement for Margret and are involved in the DSS home study process.

For all of these reasons numerated above,

1. The Department believes that the child is at risk of physical abuse and/or neglect by her paternal uncle and his wife in Uganda;

2. The child returning to Uganda is contrary to the welfare of the child.

3. The Department has made reasonable efforts to find the child a permanent foster home.

Signed under the pains and penalties of perjury this nineteenth day of July 2001.

Doreen A Woodside

Doreen A. Woodside
Social Worker, Department of Social Services

# A FAX MESSAGE FROM DSS FRAMINGHAM

## DEPARTMENT OF SOCIAL SERVICES
### Framingham Area Office
### 63 Fountain Street
### Framingham, MA 01702
### Phone: 508 424-0100 / Fax: 508 872-8340

**TO:** Renee Kaile (617) 422-0997

**FROM:** Doreen Brooks

**DATE:** 6/12/03

**# of PAGES:** 12 including cover

**RE:** Margret Bikenya

**MESSAGE:** Info on why she came into care (voluntary intake /assessment/ Affidavit) school transcript and report card

Renee,
Let me know if you need more info.

*The attached documents contain sensitive and confidential information which may be privileged. Further dissemination of this information is prohibited. If you have received this transmission in error, please contact this office immediately to arrange for its return or destruction.*
*Thank you.*

# EXHIBIT C

Letter from Plaintiffs, DSS Commissioner, to Defendant requesting adjudication of long delayed cases with attached list that includes Margaret Bukenya's case, September 27, 2004.



MITT ROMNEY
Governor
◆
KERRY HEALEY
Lieutenant Governor
◆
RONALD PRESTON
Secretary
◆
LEWIS H. SPENCE
Commissioner

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
**Department of Social Services**
24 Farnsworth Street, Boston, Massachusetts 02210
Tel (617) 748-2000 ◆ Fax (617) 261-7435

September 27, 2004

Denis Riordan, District Director
U.S. Citizenship and Immigration Services
Department of Homeland Security
John F. Kennedy Federal Building
Government Center
Boston, MA  02203

Re:  Special Immigrant Juveniles

Dear Mr. Riordan:

I am writing to request your assistance with resolving an issue that is of critical importance to the Massachusetts Department of Social Services and the immigrant children in our custody.

As I believe you know, we regularly file petitions for special immigrant status and applications for adjustment of status for foreign born children who are in our custody. These I-360/I-485 applications are filed with your office and handled by the Examinations Section.

I have attached a list of pending applications which have yet to be adjudicated. As you can see, many of these children were interviewed over a year ago. One of the children was interviewed in 2001. Another child will be 21 in December. In some cases, we were asked to provide additional documentation and we have done so. Some of the children will need new fingerprints if they are not decided promptly and will require our workers to accompany them through the process once again.

I am asking for your assistance because these delays cause real hardships for the children at issue and severely tax the limited resources within our offices.  We struggle to provide the best services possible in a challenging environment. We try to do so in an expeditious manner, not only because federal child welfare law requires it, but because it is appropriate to be mindful of a child's sense of time.

Rest assured, we carefully review the circumstances of immigrant children in our custody and support I-485/I-360 petitions/applications only when we believe that the children at issue meet eligibility criteria as special immigrant juveniles. We have modified our procedures to try to provide your officers with everything they need by the time of the interview. We provide detailed documentation of the circumstances of abuse, neglect or abandonment which caused us to take custody. We are willing to do whatever we can on our end to give you what you need to make final decisions in a timely manner.

I would appreciate your assistance in resolving these cases as soon as possible. I invite your suggestions as to what we can do going forward to work together to resolve any issues that are causing delays. We would welcome an opportunity to meet with you and your staff for an information session during which we could share information regarding agency procedures and answer any questions you may have about our agency. If you would like to arrange such a meeting, please call our Deputy General Counsel, Dianne Curran at 617-748-2020. You may also feel free to contact Attorney Maureen O'Sullivan, who is handling the I-360/I-485 applications now before you and she will follow up with us.

Thank you for your consideration.

Sincerely,

Lewis H. Spence
Commissioner

Cc:    Dianne Curran, Esq.
       Maureen O'Sullivan, Esq.

## KAP   N, O'SULLIVAN & FRIEDMAN  LP

Attorneys At Law

Ten Winthrop Square • Third Floor, Boston, Massachusetts 02110
E-Mail: info@kof-law.com • *www.kof-law.com*

Harvey Kaplan
Maureen O'Sullivan
Jeremiah Friedman

Tel: (617) 482-4500
Fax: (617) 451-6828
Fax: (617) 451-6826

## DSS CASES TO BE ADJUDICATED

To:     Ms. Myra Strauss
From:   Maureen O'Sullivan
Re:     Special Immigrant Juvenile
Date:   September 22, 2004

| Name | DOB | A# | Date of Interview |
|------|-----|-----|-------------------|
| Peter Francois | 07/15/1984 | 78 629 893 | 10/02/2001 |
| Yan Luz | 05/10/1986 | 79 678 888 | 04/22/2003 |
| Nancy Guerrier*** | 12/05/1983 | 79 678 852 | 05/19/2003 |
| Freda Kahinda | 02/02/1985 | 79 680 762 | 05/19/2003 |
| Carlos Chinchilla | 05/16/1984 | 79 679 434 | 05/22/2003 |
| Margaret Bukenya | 08/15/1986 | 79 679 221 | 06/18/2003 |
| Ramon Torres | 03/15/1986 | 44 731 017 | 09/02/2003 |
| Mary Ajede | 05/05/1984 | 76 002 201 | 07/01/2003 |
| Filemon Cruz | 11/07/1984 | 96 407 997 | 12/10/2003 |
| Andres F. Garcia | 11/19/1984 | 96 409 328 | 02/17/2004 |
| Christelle Aka | 03/05/1986 | 96 409 327 | 02/17/2004 |

## ***Please note: Nancy Guerrier will turn 21 on December 5, 2004.

# EXHIBIT D

Defendant's notice of intent to deny this case, October 14, 2004



*Boston District Office*

**U.S. Department of Homeland Security**
JFK Federal Building Government Center
Boston, MA 02213

**U.S. Citizenship and Immigration Services**

*Please Refer To This File Number: A079 679 221*



OCT 1 4 2004

Margret Nabukenya
C/o Department of Social Service
Attn: Doreen Brooks
63 Fountain Street
Framingham Ma 01702

## NOTICE OF INTENT TO DENY VISA PETITION

Reference is made to the Petition for Special Immigrant filed at Boston, Massachusetts on November 01, 2002, under the provisions of Section 203(4) of the Immigration and Nationality Act. As a special immigrant juvenile as described in Section 101(a)(27)(J)(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who has been deemed eligible by that court for long-term foster care due to abuse, neglect, or abandonment.

You entered the United States at Denver on June 21, 2000, as a visitor. On November 01, 2002, you filed the above stated petition along with an application to register for permanent residence.

On June 13, 2003, you appeared for an interview. The interviewing officer carefully reviewed a report filed by Stephen Schneider a court investigator for the Framingham Juvenile Court. The report indicates that Doreen Woodside, a social worker for the Department of Social Services, said that you were helped by a "good uncle" in Uganda to get paperwork to leave Uganda. Doreen Woodside further stated that she was frustrated with the assessment because she only had your account of the events in Uganda. The report indicates your foster mother Luciana Andreazi indicated that you revealed to her that your school counselor in Uganda, "Mr. Matof" after hearing of your mistreatment arranged for you to travel to the singing competition in Colorado. The report indicates that a woman named Elizabeth Ssentonga was originally "reticent" to be interviewed but did admit she took you in when you arrived from New York. The report indicates Diane Curran, an attorney with the Department of Social Services said that if your abuse in Africa "could be documented and the abuse would likely continue it would be possible that you would be allowed to stay in the United States". The report further indicates your date of birth to be August 15, 1987, and your mothers' name to be Juliet Namugenia.

On December 18, 2003, you submitted a birth certificate in which you claim is your true birth certificate. The birth certificates indicates your date of birth to be August 15, 1986, and your mothers' first name to be Gorretti Nakate. The attorney who helped you file the above-cited petition and application indicates that Gorretti is your mothers' official name "rather than her tribal name."

After a complete review of the record and the documentation provided it has been determined the Service is unable to verify your true identity. The Service has not yet been able to verify the authenticity of the death certificates you submitted. The death certificates indicate your parents died of natural death. There appears to be information in the file indicating your parents died of AIDS. The death certificates reflect registration of death occurred on July 31, 2003. The Department of States Foreign Affairs Manual indicates that death registrations in Uganda have become compulsory.

**Matter of Brantigan**, 13 I&N Dec 493 (BIA 1966), states that the burden of proof to establish eligibility for the benefit sought lies with the petitioner. It has been established that you have failed to establish eligibility for the benefit sought.

Based on all of the above information it is unclear how the court reached the decision to issue an order regarding your eligibility for special immigration status.

Please be advised that you have eighteen (18) days from the date of this letter to respond and to present evidence that in your opinion will justify a reconsideration of this determination. Included in your response should be a reasonable explanation. At the end of that time, a decision will be made with the information available.

Sincerely,

Denis C. Riordan
District Director

cc:    Maureen O'Sullivan
       Ten Winthrop Square Third Floor
       Boston Ma 02110

# EXHIBIT E

Plaintiffs response to notice of intent to deny, November 22, 2004

**KAPLAN, O'SULLIVAN & FRIEDMAN, LLP**
Attorneys At Law

Ten Winthrop Square • Third Floor, Boston, Massachusetts 02110

E-Mail: info@kof-law.com • *www.kof-law.com*

Harvey Kaplan                                                                      Tel: (617) 482-4500
Maureen O'Sullivan                                                                 Fax: (617) 451-6828
Jeremiah Friedman                                                                  Fax: (617) 451-6826
November 22, 2004

Dennis Riordan
District Director
Boston District Office
U.S. Department of Homeland Security
USCIS
15 New Sudbury St.
JFK Federal Building
Boston, MA 02203

**Re:    Beneficiary- Margaret Bukenya , A 79 679 221**
**Petitioner-Department of Social Services**
**Response to Notice of Intent to Deny Visa Petition**

Dear Mr. Riordan:

On October 14, 2004, you issued a notice of intent to deny the visa petition filed by the Department of Social Services to accord special immigrant juvenile status to Margaret Bukenya. Thereafter we requested an extension and you granted a 30 day extension until November 24,2004.

In your notice of intent to deny this visa petition you raised several issues regarding Margaret's identity. In short, the issues include Margaret's birthday, her mother's name, and the cause of her parents' death. In an effort to clarify this information, I have enclosed 2 affidavits, one from Margaret herself and another from her Social Worker Doreen Brooks. In addition, we have enclosed a letter from Margaret's long-time therapist, Jonankarina Whisenant as well as some information about birth registrations in Uganda. Taken together I believe that these documents adequately explain why Margaret may have initially been incorrect about her mother's name and the year of her birth. All indications from the evidence are that both of Margaret's parents are dead and that she has not lived with either parent since she was a very young child.

**Date Of Birth**

Margaret's birth certificate as well as her passport list her birthday as August 15, 1986. These are both documents issued by the Republic of Uganda and we have no reason to doubt their authenticity. While Margaret herself always believed her birthday to be August 15, 1987, a child only knows his or her birthday by what they have been told by adults. Since Margaret is an orphan who has been passed from relative to relative since an early age, it is not unreasonable that somewhere along the line she may have become confused about the year of her birth.

## Mother's Name

The same is true about Margaret's mother's name. Margaret remembers her mother's name as Jovret Nakate. However, as is explained in the enclosed affidavit, she has not lived with her mother since she was a very small child and has not seen her mother since her mother brought her to visit her father just before her father's death. All of these events occurred before Margaret attended school, at a time when she was not literate. She explains in her application that when she lived in Africa she did not see her mother's name written. Therefore, when her uncle sent her mother's death certificate which stated her official name as Goretti Nakate, Margaret learned her mother's official name for the first time. I myself corresponded with Margaret's uncle Simon Yiga and questioned him both about the mother's name and also about the fact that Margaret actually thought her mother had died earlier than indicated in the death certificate. The uncle explained that Margaret did not live with her mother for much time at all which is why she didn't know the details. Both the parents death certificates as well as Margaret's birth certificate indicate that the information was given by Simon Yiga, her father's brother.

## Cause of Death

Margaret believes her parents died of AIDS, although the death certificates list cause of death as natural death. The stigma attached with AIDS has been widely publicized . The fact that the death certificates do not list AIDS as cause of death, does not negate the fact that Margaret has submitted death certificates of both parents. The cause of death is not relevant to whether Margaret has been abandoned by her parents. Margaret explains in her own affidavit that she knows her father died of AIDS, again because she was told by her family members. This is the only way that a young child could reasonably be expected to gain information about a parent's cause of death. Since her mother never came back for her and later also died, it was reasonable for Margaret to assume that her mother also died of AIDS. The fact remains that this is a child who has been without parents since a young age and who meets the definition of special immigrant juvenile.

The standard in special immigrant juvenile cases is set forth in the statute in Section 101 (a)(27)(J) of the Immigration and Nationality Act. That defines special immigrant juveniles as "juveniles deemed eligible for long term foster care based on abuse, neglect or abandonment." The regulations further provide that eligible for long term foster care means "a determination has been made by the Juvenile Court that family reunification is no longer a viable option." 8 CFR 204.11 (a)

The standard for adjudicating special immigrant juvenile petitions are set forth in some detail in a memorandum from USCIS headquarters published by William R. Yates on May 27, 2004. That memorandum indicates that all special immigrant juvenile cases must be supported by a court order which established the three statutory criteria 1) that the child has been declared dependant on the Juvenile Court and placed in state custody, 2) that the child has been deemed eligible for long term

foster care based on abuse, neglect or abandonment and 3) that there must be a finding that it would not be in the child's best interest to return to his or her home country or that of the parent. I believe that the enclosed evidence answers the questions raised in your notice of intent to deny.

## Letter from Margaret's Therapist

Please find enclosed a detailed letter from Jonankarina Whisenant of the Wayside-Metro West Counseling Center in Framingham. Ms. Whisenant has been Margaret's counselor for the past three years from October 2, 2001. This is eight months before we filed her application for special immigrant juvenile status with your office. Ms. Whisenant describes why she believes that Margaret is telling the truth about the fact that her parents are dead and that she expirenced abuse in Uganda. Specifically Ms. Whisenant states:

> "I have no proof that Margaret's parents are dead, however, there was no evidence of hallucinations, delusions or psychosis of any kind. The descriptions of her life in Uganda were all consistently described and the facts when repeated remained the same. Her descriptions were expressed with a heartfelt guttural sadness that would be quite difficult for any human being to fabricate. The descriptions of abuse that Margaret described were horrific, extensive and filled with the kind of repeated detail that if fabricated would require extensive study to repeat. ........

> Margaret also, on many occasions, describes her feelings of extreme longing for her own parents and the kind of love that only one's own parents could provide. .........

> In conclusion, it is my opinion that Margaret is telling the truth and her parents are deceased. It is also my opinion after working with Margaret for three years that she has experienced serious trauma and would be at significant risk should she be returned to Uganda. I can report that there was no evidence of psychosis or delusions and her story unfolded with the kind of detail and emotion that would be highly difficult to fabricate.

## UNICEF Documentation on Efforts to Register Births

This documentation from UNICEF reports the fact that the birth registration system in Uganda, which was once thriving was destroyed under the dictatorship of Idi Amin and is only now being revived with a major birth registration effort. This documentation further supports why Margaret may not have previously had a birth certificate and may have been unsure of the year of her birth until it was officially registered by her uncle when the birth certificate was requested by Immigration. Margaret was born in the village and not in a hospital which is why there was there was no hospital record from which to make the birth certificate.

Taking into consideration the enclosed evidence, I believe that Margaret and the Department of Social Services have shown that she meets the criteria for statutory eligibility for special immigrant juvenile status. Therefore please approve the petition which DSS filed on her behalf.

Thank you very much.

Sincerely yours ,

Maureen O'Sullivan
MOS:wo
Enclosures

cc: Dianne Curran, Deputy General Counsel, DSS

**U.S. Department of Homeland Security**
John F. Kennedy Federal Building
Government Center
Boston, MA 02203



U.S. Citizenship
and Immigration
Services

October 25, 2004

A79 679 221
A96 407 997
A79 680 762

Maureen O'Sullivan, Esquire
Ten Winthrop Square, 3rd Floor
Boston, MA 02110

Dear Ms. O' Sullivan:

I refer to your letters of October 20th in which you request extensions of time to respond to
the notices of intent to deny for three special immigrant juvenile petitions. The file numbers
are listed above.

Please be advised that you are granted thirty (30) days from the date of this correspondence to
Reply to the notices of intent. At the end of the thirty-day period, decisions will be made with the
information available.

Sincerely,

Denis C. Riordan
District Director

*Boston District Office*

**U.S. Department of Homeland Security**
JFK Federal Building Government Center
Boston, MA 02213



**U.S. Citizenship
and Immigration
Services**

*Please Refer To This File Number: A079 679 221*



Margret Nabukenya
C/o Department of Social Service
Attn: Doreen Brooks
63 Fountain Street
Framingham Ma 01702

### NOTICE OF INTENT TO DENY VISA PETITION

Reference is made to the Petition for Special Immigrant filed at Boston, Massachusetts on November 01, 2002, under the provisions of Section 203(4) of the Immigration and Nationality Act. As a special immigrant juvenile as described in Section 101(a)(27)(J)(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who has been deemed eligible by that court for long-term foster care due to abuse, neglect, or abandonment.

You entered the United States at Denver on June 21, 2000, as a visitor. On November 01, 2002, you filed the above stated petition along with an application to register for permanent residence.

On June 13, 2003, you appeared for an interview. The interviewing officer carefully reviewed a report filed by Stephen Schneider a court investigator for the Framingham Juvenile Court. The report indicates that Doreen Woodside, a social worker for the Department of Social Services, said that you were helped by a "good uncle" in Uganda to get paperwork to leave Uganda. Doreen Woodside further stated that she was frustrated with the assessment because she only had your account of the events in Uganda. The report indicates your foster mother Luciana Andreazi indicated that you revealed to her that your school counselor in Uganda, "Mr. Matof" after hearing of your mistreatment arranged for you to travel to the singing competition in Colorado. The report indicates that a woman named Elizabeth Ssentonga was originally "reticent" to be interviewed but did admit she took you in when you arrived from New York. The report indicates Diane Curran, an attorney with the Department of Social Services said that if your abuse in Africa "could be documented and the abuse would likely continue it would be possible that you would be allowed to stay in the United States". The report further indicates your date of birth to be August 15, 1987, and your mothers' name to be Juliet Namugenia.

On December 18, 2003, you submitted a birth certificate in which you claim is your true birth certificate. The birth certificates indicates your date of birth to be August 15, 1986, and your mothers' first name to be Gorretti Nakate. The attorney who helped you file the above-cited petition and application indicates that Gorretti is your mothers' official name "rather than her tribal name."

After a complete review of the record and the documentation provided it has been determined the Service is unable to verify your true identity. The Service has not yet been able to verify the authenticity of the death certificates you submitted. The death certificates indicate your parents died of natural death. There appears to be information in the file indicating your parents died of AIDS. The death certificates reflect registration of death occurred on July 31, 2003. The Department of States Foreign Affairs Manual indicates that death registrations in Uganda have become compulsory.

**Matter of Brantigan**, 13 I&N Dec 493 (BIA 1966), states that the burden of proof to establish eligibility for the benefit sought lies with the petitioner. It has been established that you have failed to establish eligibility for the benefit sought.

Based on all of the above information it is unclear how the court reached the decision to issue an order regarding your eligibility for special immigration status.

Please be advised that you have eighteen (18) days from the date of this letter to respond and to present evidence that in your opinion will justify a reconsideration of this determination. Included in your response should be a reasonable explanation. At the end of that time, a decision will be made with the information available.

Sincerely,

Denis C. Riordan
District Director

cc:    Maureen O'Sullivan
       Ten Winthrop Square Third Floor
       Boston Ma 02110

## AFFIDAVIT OF MARGARET BUKENYA

I, Margaret Bukenya hereby swear the following to be true:

1.    I make this affidavit to respond to some of the questions in the notice of intent to deny my visa petition.

## BIRTH DATE

2.    I have always thought that my birthday was August 15, 1987, but when my birth certificate arrived, it says August 15, 1986. My father's last name is Bukenya. In Uganda, they usually add "Na" at the beginning of the last name when the child is a girl. I believe this is why my birth certificate says Nabukenya.

## DEATH OF FATHER

3.    I know that my father died because I saw him after he was dead. This happened when I was very young. I actually do not remember how old I was.

4.    Before my father's final illness my mother took me to see him. I stayed in the home of some of his extended family members and visited my father. I remember that he was very thin and people said that he was dying. However I liked to visit him because he would take me on his lap and always seemed very happy to see me.

5.    I remember when he died that there were lots of people crying. I saw him laying out in the middle of the house.

6.    After my father died, I was passed around to various houses with different relatives on my father's side of the family. I was sexually abused by men in the family and physically abused by others. I was miserable and hoped that my mother would come and get me and take me to live with her but she never came.

## MOTHER'S NAME AND DEATH

7.    My mothers name, as I remember it, was Jovret Nakate. However, when I was with my mother I was a very young child. I did not read or write and I never recall seeing my mothers name written when I lived in Uganda.

8.    The last time I saw my mother was when she took me to visit my father before his final illness.

9.    My uncle, Simon Yiga's wife talked about my father dying of AIDS. I remember her talking about this because my father had 2 brothers who also died of AIDS and my aunt would talk about the fact that three brother all died of the same thing.

10.     After my father died and I was living with relatives as a sort of servant girl, and my mother did not come to get me, I thought that she must have died of AIDS too.

11.     When I went for my interview with the Immigration Service, the Immigration Officer asked us for the death certificate of my parents. We tried to contact my uncle Simon Yiga. I found his email address with the help of a teacher at school. We found this by looking up the school where he used to teach. Once I had the email address I gave it to my social worker Doreen Brooks who contacted him directly.

12.     When he sent my parents death certificates, I was surprised to learn that my mother had not died until 2001, after I had come to the U.S. I was also surprised that her name was listed as "Gorretti Nakate" I believe that the spelling of her name on the court report as Juliet Namugenia may simply be a different spelling of her first name which I remember Jovret and my own last name Bukenya or Nabukenya.

13.     I know that both the death certificates say that my parents died of natural causes. My family told me that my father died of AIDS. There were many people dying of AIDS in Uganda. Since both my parents died at a young age, I believe that they both died of AIDS; however, this may have been reported as natural causes. Maybe people are ashamed of reporting AIDS.

14.     I ask you to approve my application for a green card because I have lost my parents. Although I do not know the specifics of my mothers death, I know that I have not seen her since before my father died when I was very young and I sincerely believe she is dead.


Signed under the pains and penalties of perjury this _____15th_____ day of November 2004.

                                        _____
                                        Margaret Bukenya


Subscribed and sworn to before me this 15th day of November 2004.

                                        _____
                                        Notary Public
                                        My Commission Exp.

# AFFIDAVIT OF SOCIAL WORKER

I, Doreen Brooks, hereby swear the following to be true:

1.  I am the social worker working with Margaret Bukenya, also known as Margaret Nabukenya.

2.  I make this affidavit in response to the notice of intent to deny the petition filed by the Department of Social Services on behalf of Margaret Bukenya. Specifically I want to explain how we obtained the birth certificate for Margaret and the death certificates of her parents.

3.  I contacted Mr. Simon Yiga who I believe is Margaret's uncle, the brother of her father. I contacted him by email. Margaret had given me his email address which she obtained through the help of a teacher at school. I explained to Mr. Yiga that Immigration had requested the death certificates of her parents as well as Margaret's birth certificate and he eventually obtained the certificates and sent them to the U.S. with someone who was traveling here.

4.  When the certificates arrived I realized that some of the information such as Margaret's mothers name did not match the information which we previously had; however we submitted these certificates in good faith since Immigration had asked for them and the deadline was approaching.

5.  I can vouch for the fact that when Margaret first came into DSS custody in that she was experiencing severe post traumatic stress symptoms. Specifically she was having nightmares, screaming and yelling in her sleep. For this reason the woman who was caring for her brought her to DSS seeking voluntary services because she said that Margaret's behavior was upsetting the other children in the house. Because she was so symptomatic, I referred her to Jonakarina Whisenant at the Wayside Counseling Center. Margaret worked with Jonakarina for the past three years and has only recently finished that counseling.

Signed under the pains and penalties of perjury this ___15th___ day of November 2004.

_Doreen Brooks_
Doreen Brooks

Subscribed and sworn to before me this _15th_ day of November 2004.

_____
Notary Public
My Commission Exp.



youth & family
support network

*Building Strength, Hope and Resiliency*

75 Fountain Street, Framingham, MA 01702-6210 • Tel: (508) 879-9800 • Fax: (508) 875-1348 • web site: www.waysideyouth.org

**Board of Directors**
Donald S. Keller, *Chairperson*
Claire Bryant, *Vice Chairperson*
Maribeth P. Hedgpeth, *Clerk*
Daniel L. Sullivan, *Treasurer*
Edward A. Cohen, Ed.D.
Leo G. Corsetti, Jr.
Robert D. Cushing
Barbara E. Gray
Adrian K. Haugabrook, Ed.D.
Elise K. Herz
Ilma N. Paixao
Roberta G. Leis
June Robertson

**Counseling and Substance Abuse Services**
BeaverBrook Counseling Ctr • (781) 891-0555
Central Intake • (800) 4WAYSIDE
Clinica Wayside Assabet • (508) 460-1504
Community Counseling Ctr • (508) 478-6888
Early Intervention • (781) 891-0555
MetroWest Counseling Ctr • (508) 620-0010
Trauma Intervention Services • (508) 478-6888
Wayside Day Center • (508) 879-9800

**Family-Based and Outreach Services**
Community LINKS • (508) 620-0010
Gay/Lesbian Youth Services • (800)4WAYSIDE
Family-Based Residential • (508) 879-9800
Homebase - Take Charge • (781) 891-0555
Wayside Family Works • (508) 620-0010
Wayside Multi-Service Ctr • (617) 926-3600

**Residential and Educational Services**
Harbinger - Dennison • (508) 872-6008
Harbinger - Edgell • (508) 872-5665
Shortstop • (617) 776-3377
Sudbury Street - BTR • (508) 624-4243
Twelve Prescott • (781) 643-1668
Wayside Academy • (508) 786-9424

Eric L. Masi, Ed.D.
*President, CEO*

**Wayside-MetroWest Counseling Center**
88 Lincoln Street
Framingham, MA 01702
Tel: 508 620 0010
Fax: 508 626 7625

11/18/04

Denis Riordan, District Director
U.S. Citizenship and Immigration Services
JFK Federal Building
Government center
Boston, MA 02203

Dear Mr. Riordan,

This letter has been requested by immigration lawyer Maureen O'Sullivan and is on behalf of Margaret Bukenya's special immigrant petition.

I am licensed in the State of Massachusetts as a Mental Health Counselor and have been working in the field of mental health since 1983. I have been a fee-for-service clinician providing outpatient psychotherapy services out of Wayside Youth and Family Support Network's Wayside-Metrowest Counseling Center since July 1, 1997. The majority of my clinical work within Wayside has been with adolescents and adults. I also have a comprehensive professional history of treating individuals with diverse cultural backgrounds.

This clinician provided individual psychotherapy for Margaret Bukenya from October 2, 2001 to October 12, 2004. Margaret was referred for treatment by Doreen Brooks, her social worker from the Department of Social Services. Ms. Brooks referred Ms. Bukenya for treatment stating to the Intake Department that Margaret "was orphaned in Africa and physically and sexually abused by subsequent caregivers." Margaret's then foster parents "noted symptoms of PTSD." Margaret was also reported to have the stress of cultural differences and adaptations.


ACCREDITED

A United Way
Member Agency

Upon initial presentation, Ms. Bukenya, (then reported to have a DOB of 8/15/87) was a 14 year old, 9th grade student at Framingham High School who presented with symptoms of depression and post-traumatic stress disorder. Margaret presented with sadness and anger and had difficulty understanding American culture and the culture of the foster family with whom she lived. Margaret indicated she also had stress because the foster family was very open and emotional and her own culture was more reserved in affect. Margaret had a poor appetite, nightmares and sleeping problems. She was oriented times three, appeared to have an intact memory and displayed impulse control that was within normal limits. She denied being suicidal or homicidal, had appropriate and relevant thought content and was able to give good eye contact. Margaret did not know what counseling was but was happy to make a connection to this therapist. Margaret stated at the intake that she tried to kill herself in Uganda because she was treated so badly but after coming to America she felt hope. Margaret's biggest concern remained the fear of having to return to Uganda. Margaret came to America with a singing group that was sent to Colorado temporarily. Margaret stated that a friend in Uganda felt deep compassion for Margaret and the amount of abuse she was enduring and allowed Margaret to attend in her place. Margaret states that when she arrived in Colorado she made up her mind she would not return and was able to appeal to an American woman somehow connected with the singing group. This woman then took Margaret to Boston to live with her first placement with "Elizabeth," a married woman from Uganda who agreed to take Margaret in. Margaret was then taken in by a local family that she met through the school she was attending. Margaret then went to live with Sara Rivera who is currently her foster mother.

Margaret reported nightmares, withdrawn behaviors and demonstrated consistent responses to situations that were difficult for her to navigate emotionally without feeling blamed, accused or used as a servant. Margaret was having difficulty living with the family of her second placement because she did not have enough personal space and was unable to develop cooperative relationships with the four biological children. The foster parents made attempts to engage Margaret in family activities (cooking together, doing homework together) but it was Margaret's feeling that she was seen as a servant, taking orders and needing to clean up after them. Throughout treatment Margaret struggled with this perception in other relationships (such as with Sara Rivera, her current foster mother and also with her adult friend) as well and relived many of the feelings (of being used as a servant) that were seemingly originated in her home country of Uganda. Margaret was not conscious of this perceptual pattern, which did not begin to resolve until several years into treatment. Given the spontaneous consistency and intensity of this responsive pattern, Margaret's PTSD appeared quite authentic. In the course of her treatment, Margaret's history revealed a very unstable upbringing, having lived with multiple caregivers and utilized as a servant.

It was reported to this therapist by Margaret and her DSS worker on separate occasions that both of her parents died of AIDS. Margaret's mother was from Ankole and her father from Uganda and although Margaret has a number of half-siblings she was the only child from this particular union. Margaret said she was not allowed to live with her mother because her parents were from opposing tribes and that in Uganda when the parents are from different tribes, the child must live with the father. Margaret's father was reported to

be too ill to care for her and was sent to live with her paternal uncle. Margaret described that when the biological parents are unable to care for their children, the paternal uncle is automatically responsible for all nieces and nephews. Margaret also described living with various individuals who took her in her to live with them so she could function as a servant. Additionally, during the time of her various living situations, Margaret stated with much tearful emotion that she was sexually abused by various men at random times. Although Margaret could not remember the exact ages of all her abuse from descriptions Margaret might have been as young as 5 years old. Margaret described orphans as vulnerable and unprotected and commonly utilized as servants in Uganda who are easy prey for sexual abuse.

After various living situations, Margaret was sent to live with her father's brother who frequently was not home and overwhelmed not only by his job but by his own 5 children and multiple nieces and nephews for whom he wound up being responsible for due to the instability and illnesses of his brothers inability to care for their own children. Margaret reported that her uncle was not in the home much of the time and was left under the care of his wife whom Margaret refers to as her aunt. Margaret described her aunt as very spiteful who retained much hatred for Margaret. Margaret was responsible for all the cooking, cleaning, water fetching and household chores. Margaret endured severe neglect in inhuman conditions and describes for example sleeping on the floor of a room where a snake would frequently slither on her body during the night. Margaret was not allowed to have friends, to socialize with peers or otherwise carry on any semblance of the same life style that her cousins were provided. Margaret did attend some school although having to pay for school, Margaret was frequently sent home because she was not given any money. Margaret reports she was not only utilized as a servant, but was frequently physically abused by this aunt. Margaret states she still has scars on her body from the nail laden wooden boards her aunt beat her with. Margaret alleges she was also mistreated by her cousins, the children of this woman. After some time Margaret was able to make a connection between this aunt and the conditions under which she herself had to live. Margaret reports that her uncle impregnated another woman who lived in England and the abusive aunt knowing about this relationship was made to raise the little girl who Margaret believes still lives in this household. Margaret also has had several conversations over the phone with her uncle confronting his behavior, neglecting her by knowingly allowing such abuse to occur. Margaret has showed this clinician actual e-mails from her uncle apologizing for Margaret being hurt and making attempts to reconcile with her.

I have no proof that Margaret's parents are dead, however, there was no evidence of hallucinations, delusions or psychosis of any kind. The descriptions of her life in Uganda were all consistently described and the facts when repeated remained the same. Her descriptions were expressed with a heartfelt guttural sadness that would be quite difficult for any human being to fabricate. The descriptions of abuse that Margaret described were horrific, extensive and filled with the kind of repeated detail that if fabricated would require extensive study to repeat. Margaret did not have access to violent media such as books, television and films in Uganda and once in America the close supervision from the foster family and Sara Rivera limited this kind of exposure. Margaret did consistently

describe her father's death. Margaret maintains that when she was about 5 years old she was told her father was dying. She describes walking a very long way to the home of the relative where he was residing. Margaret describes seeing her father laid out in the corner of a room and the house filled with many people. Margaret describes poignantly her pleas to know, "what is wrong with my father," and her hysteria upon the realization of his death (and subsequently the meaning of death). During Margaret's description of this event her emotions were very deeply felt and expressed, she cried for a significant period of time. Margaret reports having had little contact with her mother. Margaret did say that she was not told about her mother's death for a significant period of time. Margaret states she was told by her uncle who wanted to spare her feelings. Margaret also, on many occasions, describes her feelings of extreme longing for her own parents and the kind of love that only one's own parents could provide. Margaret noted with depth the significant maternal bonds that she witnessed between her foster parents and their biological children and stated her desire for the same.

In conclusion, it is my opinion that Margaret is telling the truth and her parents are deceased. It is also my opinion after working with Margaret for three years that she has experienced serious trauma and would be at significant risk should she be returned to Uganda. I can report that there was no evidence of psychosis or delusions and her story unfolded with the kind of detail and emotion that would be highly difficult to fabricate. It was my role to treat her symptoms, and help her to function in the healthiest and most productive capacity that she was capable of achieving.

Sincerely,

Jonakarina C. F. Whisenant, MA, ADTR, LMHC

# Cambodia Adoption Issues

« Cambodia disappointed over U.S. human-trafficking report
» Status Quo: June 18 2002

Return to front page
Return to archives

# Millions of children unregistered at birth worldwide - UNICEF

Read the press release here, the report (PDF) here and the factsheet here.

UNICEF Press release

Millions of babies go unregistered at birth, denied their identity, a recognized name and a nationality says UNICEF report

"Lack of birth registration is a violation of the child's inalienable human right to be given an identity at birth and to be regarded as part of society." Birth Registration - Right from the Start.

GENEVA/NEW YORK, 4 June 2002 - A United Nations Children's Fund (UNICEF) study has revealed that millions of babies go unregistered at birth, denying them an official identity, a recognized name and a nationality.

Using the most recent data available, the UNICEF report, entitled Birth Registration - Right from the Start, estimates that 50 million babies were not registered in the year 2000 - 41 per cent of births world-wide. In 19 countries, at least 60 per cent of all children under the age of five were not registered at birth.

The report calls for free birth registration for all children.

"These children have no birth certificate, the 'membership card' for society that should open the door to a whole range of other rights including education and health care, participation and protection", says the report.

In later life, the unregistered child may be unable to apply for a passport or formal job, open a bank account, get a marriage licence, stand for elective office or vote.

"A birth certificate is one of the most important pieces of paper a person will ever own," said Carol Bellamy, UNICEF Executive Director. "If we do not get it right from the start and register babies, it is an up-hill battle from there on. Unregistered children lack the most basic protection against abuse and exploitation and become a more attractive commodity to a child trafficker, illegal adoption rings, and others who seek to take advantage of their non-status," she said.

The right to be registered immediately after birth and to acquire a name and a nationality is recognized under article 7 of the Convention on the Rights of the Child. This was reinforced by the recent UN General Assembly Special Session on Children which called on all Member States to develop systems to ensure that all children in the world enjoy such rights.

The UNICEF report notes that unregistered children are, almost inevitably, the children of the poor and excluded and that, in today's world, with massive population movements, organised child trafficking and the growing impact of armed conflicts upon children, birth registration is more essential than ever.

The value of birth registration continues to be overlooked, according to the report. It says that registration is a critical measure to secure the recognition of every person before the

law, to safeguard the protection of his or her individual rights, and to ensure that any violation of these rights does not go unnoticed. Proof of age is an important first step in protecting children from age-related abuse and exploitation, including military recruitment and involvement in armed conflict, child labour and early marriage, says the report.

"Birth registration is a fundamental step towards good governance and a vital element in securing democratic systems," said Bellamy. "The root causes of non-registration are often economic and political, and as such it is a core development issue that must be addressed alongside poverty reduction and universal access to basic services."

The UNICEF report shows the percentage of annual births not registered by region in 2000. In sub-Saharan Africa, over 70 per cent of births went unregistered, as were 63 per cent in South Asia. South Asia tops the league in terms of sheer numbers of unregistered children, with approximately 22.5million, or over 40 per cent of the world's unregistered births in 2000, compared to a total of around 17 million in sub-Saharan Africa. In the Middle East and North Africa, nearly one-third of the children born in 2000 (or some 3 million) lacked legal recognition of their identity, while in the East Asia and Pacific region 22 per cent of births in 2000 - some seven million children - were unregistered.

The UNICEF report says universal registration is a goal within the reach of all states. It calls for measures to reach that goal, in particular:

- providing sufficient resources so that birth registration is free of charge in every country.
- passing new legislation or updating and harmonizing old laws to facilitate registration rather than penalize non-registration.
- ensuring adequate registration offices and trained personnel to guarantee that no child is left behind.
- mainstreaming birth registration with other governmental activities and 'piggy - backing' on other service delivery

Case 1:05-cv-10943-RBW    Document 1-5    Filed 05/06/2005    Page 14 of 20    Page 4 of 7

programmes, including immunization and school enrolment.
- encouraging demand by raising awareness of the importance
of birth registration and involving all levels of society, including
local communities.

Countries waging successful campaigns to raise their birth
registration levels:

Uganda once had a thriving registration system. Created in
1904, the system covered the entire country by 1930 but was
completely unravelled as a result of bloodshed under General
Idi Amin and the years of turmoil that followed. Uganda is now
making great efforts to revitalise its registration system, with
encouraging results. In its first year of implementation, one
million children were registered.

The Philippines conducts a mass campaign every February -
designated 'civil registration month'. Awards for the best
performing registrars complement nation-wide publicity about
the importance of registration.

In Bangladesh, while overall levels of birth registration are still
low, recent campaigns have resulted in the registration of over
four million children.

India has established national registration campaigns
operating in 15 different languages. It includes television and
radio spots, posters, stickers, billboards, and publicity and
documentary films shown in cinemas.

In Thailand, the Child Friendly Schools Programme is helping
children to learn about their rights, including birth registration.

The birth registration campaigns in recent years in Angola
have demonstrated that, despite the devastation of war,
popular demand for birth registration can be extremely high.
The first four months of a campaign begun last year saw the
registration of more than 230,000 children.

Countries where significant numbers of children are unregistered:

In Rwanda, birth registration stood at over 80 per cent in 1973, but birth certificates with information on the holder's ethnic origins were used to deadly effect by genocide killers in 1994. By 1998 Rwanda was among the countries with the lowest levels of birth registration, although the most recent figures give some grounds for optimism.

Cambodia's registration records were destroyed under the Pol Pot regime and the Government is still rebuilding its civil registry.

In Niger, only an estimated 45 per cent of births are registered (fewer among the nomadic population).

In China, it is estimated that the number of unregistered children may be as high as six million.

In Indonesia, the fourth most populous nation in the world, 37 per cent of children under five had not been registered in 2000.

In Turkey, some 26 per cent of children under five years of age go unregistered.

In Nicaragua, a combination of fragmented, outdated legislation and budgetary restraints has contributed to a registration rate of less than 40 per cent. A new comprehensive law for civil registration has now been drafted.

---

"Birth Registration - Right from the Start" is produced by the UNICEF Innocenti Research Centre (IRC) as part of its Innocenti Digest series. Media representatives may log onto the IRC web-site newsroom for embargoed press materials, including a press release and the full text of the report. The URL is: http://www.unicef-icdc.org/publications/

For more information, please contact:

Patrick McCormick, UNICEF Florence, 39 055 203 3354,
pmccormick@unicef.org
Wivina Belmonte, UNICEF Geneva, 41 22 909 5509,
wbelmonte@unicef.org
Jehane Sedky-Lavandero, UNICEF New York, (212) 326
7269, jsedky@unicef.org

*Posted by Dale Edmonds at June 18, 2002 03:55 AM*

---

## Comments

looking to adopt asain baby boy can u help

February 18, 2003 11:53 PM

What does it mean for a country if it does not register its
infants? doing an article on this, feedback would be
appreciated.

Thank you

boy
March 30, 2004 10:07 PM

is it possible to have a closed adoption whereby the adoptive
parents in malaysia could be assured of their names
appearing in the adopted child's (say from china) birth
certificate in malaysia? please help as we wish to adopt

kristal loo
June 26, 2004 02:57 PM



**UNICEF Innocenti Research Centre**

Piazza SS. Annunziata, 12
50122 Florence, Italy
Tel. 39055-20330 (switchboard)
Tel. 39055-2033354 (direct)
Fax. 39055-244817
E-mail: pmccormick@unicef.org
Website: www.unicef.org/irc

# K E Y   P O I N T S

*Additional
Supporting
documentation
re: Ugandan
Birth
Registration*

## *Launch of Innocenti Digest 9*
## *"Birth Registration: Right from the*
### **Embargo until 04 June 2002, at 00.01**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### What is the problem?
The births of more than 50 million children go unregistered each year
– more than 40 per cent of total births worldwide. They have no birth
certificate and, in legal terms, they do not exist. Their right to an
identity, name and nationality is denied and their access to basic
services is threatened. They are vulnerable to abuse and exploitation.
They are, almost inevitably, the children of the poor and excluded.

### What are we calling for?
This Innocenti Digest calls for free birth registration – and a free birth
certificate – for every child in every country. It calls for effective
registration systems that are compulsory, universal, permanent and
continuous, and that guarantee the confidentiality of personal data.

### Why does it matter?
Birth registration is a fundamental human right, opening the door to
other rights such as education, health care, participation and
protection from discrimination, abuse and exploitation. Effective birth
registration ensures a child's name and nationality. It can protect
children against rights violations – such as early marriage, child labour
and recruitment into armed forces – that thrive on doubts about their
age or identity. It is essential to juvenile justice, protecting children
against prosecution as adults. A birth certificate – or lack of it – may
determine whether a child can enrol in school. In later life, the
unregistered adult may be unable to vote or obtain a marriage licence.
And there are implications for the State. Countries must know how
many people there are – and how many there will be in the future – if
they are to plan their services effectively. Birth registration is integral

to good governance. It is the official recognition of a new member of society, who is entitled to all the rights and responsibilities of a valued citizen. Today, with mass population movements and organized child trafficking, it is more essential than ever.

## What is the scale of non-registration?

- An estimated 41 per cent of births worldwide went unregistered in 2000 – 50 million children in all;

- In 39 countries, at least 30 per cent of all children were not registered at birth and in 19 countries the proportion was at least 60 per cent;

- In sub-Saharan Africa, over 70 per cent of births were unregistered – around 17 million children;

- South Asia tops the league in sheer numbers, with around 22.3 million unregistered births – over 40 per cent of the world's total unregistered births;

- In the Middle East and North Africa, nearly one third of the children born in 2000 (around three million) were unregistered;
- In East Asia and the Pacific: 22 per cent of births (around seven million);
- Countries for which there is no published information include Afghanistan, Democratic Republic of Congo and Eritrea;
- Falling registration recorded in Tajikistan, Dominican Republic, Honduras;
- Disparities: urban vs. rural. Niger: proportion of children registered in urban areas is more than twice that of rural areas. In Chad, Myanmar and Senegal, registration rates in urban areas are more than 30 percentage points higher than in rural areas.

## What are the barriers to birth registration?

- Lack of awareness of the importance of birth registration as a human right;
- Lack of political will (passive or deliberate);
- Lack of effective legislation;
- Economic constraints at national level;
- The costs to the individual, in terms of money or time;
- Failure to adapt to local realities that may not be compatible with official registration system;
- Gender discrimation that excludes mothers from the registration process;
- Lack of effective registration infrastructures;

- Lack of access to registration facilities;
- War and conflict.

## What are the solutions?

A long-term approach is needed to create birth registration systems that are permanent and sustained to generate consistent supply and demand. This would:

- include every part of society, including local communities;
- involve every stakeholder by raising awareness of the importance of birth registration as a child right;
- introduce relevant legislation; ensure law reform to harmonize and enforce existing legislation;
- ensure coordination between relevant government ministries and institutions;
- build the infrastructure needed to reach every child;
- integrate birth registration in other governmental activities and 'piggy-back' on other programmes and service delivery;
- improve the capacity of the relevant government officials to do the job;
- provide the resources required to ensure a universal and effective system of birth registration.

## Examples of UNICEF support to Birth Registration:

-    **Angola:  National  Children's  Registration  Campaign** launched in August 2001 to register three million children in Angola by the end of 2002. The Angolan Ministry of Justice believes registration levels may be as low as 5 per cent. The Campaign brings together government ministries, churches, NGOs, the private sector and UNICEF. Registration is free and backed by a new law to simplify registration. Around 230,000 children were registered in the first four months of the campaign.

-    **Uganda:  Community-level  initiatives.**  The   2001-2005 Government of Uganda/UNICEF country programme includes a community-based household census as the first step towards a grassroots structure for registration. Members of the local Parish Development Committee will visit every household and the data collected will be entered in a household register. Every child between 0 and 8 years of age will be recorded – the beginning of a system that will lead to the issuing of birth certificates.

-

- ECUADOR: LONG-TERM PARTNERSHIP. **IN THE EARLY 1990S, IT WAS ESTIMATED THAT**

**ONLY 50 PER CENT OF CHILDREN IN ECUADOR WERE REGISTERED IN THEIR YEAR OF BIRTH. THE GOVERNMENT, IN PARTNERSHIP WITH UNICEF, SUPPORTED MASS REGISTRATION CAMPAIGNS IN 1995, 1997 AND 1999, CONCENTRATING ON THE BORDER AREA. THE FOCUS IS NOW ON REACHING THE COUNTRY'S INDIGENOUS CHILDREN. BIRTH REGISTRATION IN 2000 WAS ESTIMATED TO BE BETWEEN 70 AND 89 PER CENT.**

- **Getting the data.** Many of the figures in the Innocenti Digest come from the findings of the most recent set of Multiple Indicator Cluster Surveys (MICS2), developed by UNICEF in consultation with a wide range of organizations. This was part of the preparatory process for the UN General Assembly Special Session on Children in May of this year.

**\*\*\*\*\***

*"BIRTH REGISTRATION – RIGHT FROM THE START"* **IS PRODUCED BY THE UNICEF INNOCENTI RESEARCH CENTRE (IRC) AS PART OF ITS INNOCENTI DIGEST SERIES.**

**MEDIA REPRESENTATIVES MAY LOG ONTO THE IRC WEB-SITE NEWSROOM**

http://icdc/cgi-bin/unicef/presscentre/newsroom_top.sql

**FOR EMBARGOED PRESS MATERIALS, INCLUDING A PRESS RELEASE AND THE FULL TEXT OF THE REPORT.**

**For more information, please contact:**
Patrick McCormick, UNICEF Florence, 39 055 203 3354,
pmccormick@unicef.org
Wivina Belmonte, UNICEF Geneva, 41 22 909 5509,
wbelmonte@unicef.org
Jehane Sedky-Lavandero, UNICEF New York, (212) 326 7269
jsedky@unicef.org

–

# EXHIBIT F

Plaintiffs letter to Defendant
requesting a meeting to resolve
recurring issues in special
immigrant juvenile cases,
October 21, 2004

## KAPLAN, O'SULLIVAN & FRIEDMAN, LLP
### Attorneys At Law

Ten Winthrop Square • Third Floor, Boston, Massachusetts 02110

E-Mail: info@kof-law.com • *www.kof-law.com*

Harvey Kaplan
Maureen O'Sullivan
Jeremiah Friedman

Tel: (617) 482-4500
Fax: (617) 451-6828
Fax: (617) 451-6826

October 21, 2004

Mr. Denis Riordan
District Director
Boston District Office
U.S. Department of Homeland Security
USCIS
15 New Sudbury St.
JFK Federal Building
Boston, MA 02203

**FAX (617) 565-4534**

Dear Mr Riordan:

Please find enclosed a copy of the letter which was sent to you by Louis H. Spence, the Commissioner of the Department of Social Services. This is the letter which asks for your assistance in resolving the delays in adjudication of special immigrant juvenile cases at the Boston District Office and includes a list of long pending cases. During our conversation, you indicated that you have not previously seen the letter and would like a copy..

In addition, this letter asks for an opportunity to meet with you and your staff for an information session during which we could share information regarding agency procedures and answer questions about the Department of Social Services and their procedures and standards.

I am writing to reiterate this request for a meeting at your earliest possible convenience. This request has taken on some urgency now that I have received four notices of intent to deny special immigrant juvenile cases. Those notices of intent to deny all relate to cases on the list of long pending cases that was attached to Commissioner Spence's letter to you. Taken together, those notices reflect a profound misunderstanding of child welfare law and practice in Massachusetts.

First and foremost, the primary focus of decision making in child welfare is the **child** and what is in the child's best interest. The special immigrant provisions in the INA retain that focus, exempting the child from having to prove manner of entry and making many of the grounds of inadmissibilty not applicable to these child applicants. Yet that focus is totally lacking from these notices of intent to deny. For example one of the notices of intent to deny states " you cannot be deemed dependent on long-term foster care after your mother has expressed a credible interest in having you live with her again." This is simply not true. Moreover, it is not determinative of whether a child is abused, neglected, or abandoned, or the child's need for long

term foster care. Most parents whose children are placed in foster care for reasons of abuse or neglect express the desire to have their child returned to them. For reasons related to safety and stability the child may not be returned to them.

The standard in special immigrant juvenile cases is set forth in the statute in section 101 (a)(27)(J) of the Immigration and Nationality Act. That defines special immigrant juveniles as "juveniles deemed eligible for long term foster care based on abuse, neglect, or abandonment". The regulations further provide that eligible for long term foster care means "a determination has been made by the juvenile court that family reunification is no longer a viable option." 8 CFR 204.11A . The standards for adjudicating special immigrant juvenile petitions are set forth in some detail in a Memorandum from USCIS headquarters published by William R. Yates on May 27, 2004. The memorandum indicates that all special immigrant juvenile cases must be supported by a court order which establishes: 1. that the child has been declared dependant on the Juvenile Court or placed under state custody and, 2. deemed eligible for long-term foster care due to abuse, neglect, or abandonment. In addition, there must be a finding that it would not be in the child's best interest to be returned to his or her home country or that of the parents.

The immigration standard for special immigrant juvenile, as set out in the statute and regulations, focuses on the reason that the child has come into state custody. It is important to understand that many of the children who are now applying for special immigrant juvenile status have been in state custody for several years. It is one of the reasons why many of the applicants tend to be older teenagers or even almost 21. Another reason is that special immigrant juvenile status is sought only after the Department determines that the child will not be reunified with his or her parent or guardian. In all but a handful of cases, the Department is required by law to make reasonable efforts to reunify the child with his or her parents. In the cases that come before your agency, the Court has placed the child in the custody of the Department and is required to hold annual hearings to review Department's permanency plan for the child, i.e., will the child be reunified with the parents, or will the child remain in foster care until he or she exits through adoption, guardianship or planned living arraignments such as independent living. Throughout these proceedings, parents and child alike have a right to counsel.

In an effort to help Immigration Examiners understand the lengths to which DSS and the state courts go to involve the parents and to foster reunification if possible, a deputy general counsel for the Department of Social Services prepared the enclosed description of the standard process which DSS uses in each and every case. As you can see the process involves a state government agency going to great lengths to include the parents and make a careful determination regarding the best interest of the child. Yet, when that same state agency files the special immigrant cases with your office, they are often met with hostility and suspicion .

In many of these cases we have been asked to provide additional information regarding the facts

that form the basis for the juvenile court's ruling on dependency and eligibly for long-term foster care. Whenever possible we have gone to great lengths to provide all documentation requested. The memorandum from Mr. Yates described above states "the adjudicator generally should not second guess the court rulings or question whether the courts order was properly issued. Orders that include or are supplemented by specific findings of fact as to the above listed ruling would usually be sufficient to establish eligibility for consent. Such findings need not be overly detailed but must reflect that the juvenile court made an informed decision." Since Mr. Yates issued this order DSS has obtained more detailed court order to support these cases. However, many of the cases on the list and all of the cases in which we received notices of intent to deny are older cases.

In the four recent notices of intent to deny, the adjudicator has raised a variety of issues that as reasons to deny the petitions when those issues are not relevant to the essential standard of whether the child in state custody due to abuse, neglect, or abandonment. For example in one of the cases the adjudicator criticizes the child for attempting to find work in the U.S. and attempting to go to school (which the Department of Social Services would expect of a child in placement). The implication is that a child who attempts to work or go to school is somehow not eligible for special immigrant status. The same child came into DSS custody because he was homeless and living at the Pine Street Inn. The court looked at the facts of case and made a determination that his family had neglected and abandoned him. Yet, the notice of intent to deny mentions that because he still has contact with his parents and that they hope that things work out for him shows that they have not neglected him. This is a child who was wandering around the U.S. looking for work, living on the premises of his workplace and eventually becoming homeless from the age of 16. In the eyes of the state court with jurisdiction to decide legal custody and child protection, this is considered neglect. It means that the parent is not providing the child minimally adequate essential care and supervision. It does not means that the parent does not love the child or want the child to be with him or her.

We would be very grateful for an opportunity to discuss this and other issues with you and to discuss how we can move forward with better understanding of how each agency works. I believe that it should be possible for these two government agencies the, DSS, and the CIS to work together to resolve these issues in a timely manner. We would very much like to prepare and present the cases addressing the issues of most importance to you and would be very grateful to be told that directly up front rather than in the context of notices of intent to deny.

Please me know when we can appear for a meeting. In the meantime please note that I have requested a 30 day extension of time in which to respond to the following three notices of intent to deny:

Filimon Bolanos Cruz A96 407 997

Freda Kahinda A79 680 762
Margaret Bukenya A79 679 221.

I respectfully, request that we be granted an additional 30 days until November 20, 2004 to respond to these notices,. We will submit a response to the fourth case (A76 002 201) within the original timeframe.

Thank you very much.

Sincerely yours,

Maureen O'Sullivan
MOS:wo
enc.

# EXHIBIT G

Plaintiffs notice to Defendants of notice of intent to file mandamus action, February 24, 2005.

**KAPL.. , O'SULLIVAN & FRIEDMAN, LL.**
Attorneys At Law

Ten Winthrop Square • Third Floor, Boston, Massachusetts 02110

E-Mail: info@kof-law.com • *www.kof-law.com*

Harvey Kaplan
Maureen O'Sullivan
Jeremiah Friedman

Tel: (617) 482-4500
Fax: (617) 451-6828
Fax: (617) 451-6826

February 24, 2005

Denis Riordan
District Director
USCIS
JFK Federal Building
Government Center
Boston, MA 02203

## NOTICE OF INTENT TO FILE MANDAMUS ACTION IN SPECIAL IMMIGRANT JUVENILE CASES

Dear Mr. Riordan:

This is notice that we intend to file mandamus actions in the following five cases. Each of these cases has been pending for a long time. We have responded to all of your requests for evidence with all of the documents that it is possible to obtain. On September 27, 2004, the Commissioner of the Department of Social Services wrote to you with a request for your help in resolving these cases. You responded by issuing notices of intent to deny in four out of the five cases. We have responded in detail to each of those notices. Each of those responses were submitted to your office more than 90 days ago.

I wrote to you on October 21,4004, asking for an opportunity to meet with you because we feel that the notices of intent to deny demonstrated a lack of understanding of the child welfare system in Massachusetts. You told me that you would have a meeting, but to date, months have passed and these cases are still not adjudicated. This delay causes tremendous hardship for these children and the agency (DSS) which is taking care of them. They have difficulty going to school, getting jobs and going on with their lives in a way which would enable them to overcome the abuse, neglect or abandonment that each of them has suffered.

We ask you to apply the Memorandum of William Yates which specifies the legal criteria for approval of these juvenile cases. In our responses to your notices of intent to deny, we explain how each of these cases meets that criteria which is dictated by your Headquarters. We have included the case of Peter Francois on this list, even though we have not received a notice of intent to deny in that case because it has been pending for four years.

**Peter Francois, A78 629 893, interviewed 10/2/01. He ages out 7/5/05**

**Freda Kahinda, A79 680 762, interviewed 5/19/03, responded to NOID 11/23/ 04**

**Margaret Bukenya, A79 679 221, interviewed 6/18/03, responded to NOID on   11/22/04**

**Mary Ajede, A76 002 201, interviewed 7/1/03, responded to NOID on  10/21/04. She ages out 5/5/05**

**Filemon Bolanos Cruz, A96 407 997, interviewed 12/10/03, responded to NOID on 11/23/04**

As you can see from the list, two of the juveniles will age out this year.  We cannot in good conscience wait any longer to take these facts before the federal court.  We have done everything in our power to resolve these cases. **We intend to file mandamus actions in these five cases in two weeks, on March 11, 2005.**

Sincerely,


Maureen O'Sullivan


cc
Dianne Curran, Deputy General Counsel
Department of Social Services
Karen Ann Haydon
Myra Strauss

# EXHIBIT H

Defendants Memorandum #2
Field Guidance on Special
Immigrant Juvenile Status
petitions



U.S. Department of Homeland Security
425 I Street, N.W.
Washington, DC 20529

**U.S. Citizenship
and Immigration
Services**

HQADN 70/23

# Interoffice Memorandum

To:     Regional Directors
        District Directors

From:   William R. Yates  (Janis Sposato /s/)
        Associate Director for Operations

Date:   May 27, 2004

Re:     <u>Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions</u>

       The purpose of this memorandum is to provide policy and procedural clarification on the adjudication of Special Immigrant Juvenile (SIJ) petitions.  This guidance memorandum, the third since the 1997 statutory amendment, consolidates and supercedes all previous guidance issued by the Immigration and Naturalization Service.[1]

**Background**

       Section 203(b)(4) of the Immigration and Nationality Act (INA) allocates a percentage of immigrant visas to individuals considered "special immigrants" under section 101(a)(27) of the INA, including those aliens classified as special immigrant juveniles under Section 101(a)(27)(J).  Section 113 of Pub. L. No. 105-119, 11 Stat. 2440 (November 26, 1997), amended the definition of a "special immigrant juvenile" to include only those juveniles deemed eligible for long-term foster care based on abuse, neglect, or abandonment, and added two provisions that require the consent of the Secretary of the Department of Homeland Security (DHS) (formerly the Attorney General) for SIJ cases.  One provision requires *specific* consent to a juvenile court's jurisdiction over dependency proceedings for a juvenile in DHS custody; the other requires *express* consent to the juvenile court's dependency order serving as a precondition to a grant of SIJ status.  In the case of juveniles in custody due to their immigration status (either by US Immigration and Customs Enforcement (ICE) or by the Office of Refugee Resettlement (ORR)), the specific consent must be obtained *before* the juvenile may enter juvenile court dependency proceedings; failure to do so will render invalid any order issued as a result of such proceedings.

---

[1] Initial guidance was provided by memorandum dated August 7, 1998.  That was superceded by Memorandum #2, dated July 9, 1999, which is superceded by this memorandum.

Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions
HQADN 70/23
Page 2

This memorandum addresses only those eligibility issues relating to the actual adjudication of the petition for special immigrant juvenile classification and the application for adjustment of status to that of lawful permanent residence, including the concept of "express consent.". It does not address eligibility criteria relating to "specific consent.".

## Effect of SIJ approval

Approval of an SIJ petition (Form I-360) makes a petitioner immediately eligible to adjust status by filing a Form I-485. Once the Form I-485 is filed (either concurrently with the I-360, as is strongly encouraged, or subsequent to approval of an I-360), the juvenile may receive employment authorization pursuant to the pending adjustment application.[2] Juveniles who adjust status as a result of an SIJ classification enjoy all benefits of lawful permanent residence, including eligibility to naturalize after five years; however, they may not seek to confer an immigration benefit to their natural or prior adoptive parents. INA §101(a)(27)(J)(iii)(II). The granting of an SIJ petition or an application for adjustment to a juvenile confers no Federal Government duty or liability toward state child welfare agencies, even for those juveniles placed in foster care.

## Consent by Department of Homeland Security

Following the 1997 amendments to Sec. 101(a)(27)(J) and the Homeland Security Act of 2002, a juvenile alien seeking classification as a special immigrant juvenile based on a juvenile court's dependency order must have, in all cases, the "express consent" of the Secretary of the DHS. In those cases involving a juvenile in the actual or constructive custody of the federal government, the juvenile must first obtain "specific consent" to the juvenile court's jurisdiction from the Secretary, through ICE, before proceedings on issuing a dependency order for the juvenile may begin. *Specific consent* refers to a determination to permit a juvenile court, which otherwise would have no custody jurisdiction over the juvenile alien, to exercise jurisdiction for purposes of a dependency determination.

*Express consent* means that the Secretary, through the CIS District Director, has "determine[d] that neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect [or abandonment.]"[3] In other words, express consent is an acknowledgement that the request for SIJ classification is bona fide.

CIS officers adjudicating SIJ petitions need only consider whether the juvenile court order satisfies express consent requirements; however, as discussed below, information relating to a grant of specific consent may also be considered when determining eligibility for express consent.

While this memorandum does not address the criteria for issuing specific consent, officers must be satisfied that specific consent from ICE was timely granted in cases where such consent was required. This is discussed further below.

---

[2] 8 CFR 27.12(c)(9)
[3] See H.R. Rep. No. 105-405, at 130 (1997).

Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions
HQADN 70/23
Page 3


## Documentation Requirements for SIJ Petitions

Although current regulations allow for separate filing of the Form I-360 (Petition for
Amerasian, Widow(er), or Special Immigrant) and the Form I-485 (Application To Register
Permanent Residence or Adjust Status), USCIS strongly encourages concurrent filing of both forms
in order to expedite the completion of the juvenile's application.

The Form I-360 must be supported by:

- Court order declaring dependency on the juvenile court or placing the juvenile under
  (or legally committing the juvenile to) the custody of an agency or department of a
  State.
- Court order deeming the juvenile eligible for long-term foster care due to abuse,
  neglect, or abandonment.[4]
- Determination from an administrative or judicial proceeding that it is in the juvenile's
  best interest not to be returned to his/her country of nationality or last habitual
  residence (or the juvenile's parents' country of nationality or last habitual
  residence)(hereinafter "home country")[5]; and
- Proof of the juvenile's age[6].

The Form I-485 must also be supported by documentation:

- Birth certificate or other proof of identity in compliance with 8 CFR 103.2;
- A sealed medical examination (Form I-639);
- Two ADIT-style color photographs; and, where applicable, also supported by:
- Evidence of inspection, admission or parole (if available; by law an individual with
  SIJ classification is deemed to be paroled for purposes of adjustment of status[7]);
- If the applicant is over 14, s/he must also submit a Form G-325A (Biographic
  Information);
- If the juvenile has an arrest record, s/he must also submit certified copies of the
  records of disposition; and
- If the juvenile is seeking a waiver of a ground of inadmissibility that is not otherwise
  automatically waived under INA §245(h)(2)(A), s/he must submit a Form I-601
  (Application for Waiver of Ground of Excludability) and supporting documents
  establishing that waiver is warranted for humanitarian purposes, family unity, or in
  the public interest (supporting documents could include affidavits, letters, press
  clippings, etc.).

---

[4] The regulations provide: "Eligible for long-term foster care means that a determination has been made by the juvenile
court that family reunification is no longer a viable option." 8 C.F.R. § 204.11(a).

[5] INA §101(a)(27)(J)(ii) This requirement can be satisfied through a determination made by the juvenile court and
incorporated in the juvenile court order. *See infra.*

[6] Examples include an official birth certificate, passport, or foreign identity document issued by a foreign government,
such as a cedula or cartilla. 8 CFR§204.11(d).

[7] INA §245(h)(1). Although deemed paroled as a matter of law, applicants may still be subject to INA §212(a)(2)(A),
(B), and (C), §212(a)(3)(A), (B), (C), and (E), and §241(a)(5). See discussion below.

Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions
HQADN 70/23
Page 4

Applicants may also submit a Form I-765 (Application for Employment Authorization) based on the pending Form I-485, if needed.

**The Court Order**

The Court Order submitted in support of the Form I-360 *must establish*:

- The juvenile has been declared a dependent of the juvenile court or the court has placed the juvenile under (or legally committed the juvenile to) the custody of an agency or department of a State; and

The juvenile has been deemed eligible for long-term foster care due to abuse, neglect, or abandonment[8]

The Court Order will also *preferably establish* the following (these may be established in alternative ways as discussed later):

- Specific findings of fact in support of the Order, sufficient to establish a basis for USCIS express consent; and
- That it would not be in the alien's best interest to be returned to the alien's home country.

**Evidence to establish the best interests of the child not to return to home country**

As noted above, a petition cannot be granted unless it has been determined in an administrative or judicial proceeding that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence. This determination may be made by the juvenile court. USCIS strongly encourages juvenile courts to address this issue and incorporate a finding into the court order. Nevertheless, the law contemplates that other judicial or administrative bodies authorized or recognized by the juvenile court may make such a determination[9]. If a particular juvenile court establishes or endorses an alternate process for this finding, a ruling from that process may satisfy the requirement.

**Evidence to establish express consent**

The District Director, in his or her discretion, shall expressly consent to dependency orders that establish -- or are supported by appropriate evidence that establishes -- that the juvenile was deemed eligible for long-term foster care due to abuse, neglect, or abandonment, and that it is in the juvenile's best interest not to be returned to his/her home country. Such express consent should be given only if the adjudicator is aware of the facts that formed the basis for the juvenile court's rulings on dependency (or state custody), eligibility for long-term foster care based on abuse, neglect, or abandonment, and non-viability of family reunification, or the adjudicator determines that a reasonable basis in fact exists for these rulings. The adjudicator generally should not second-guess

---

[8] The regulation provides: "Eligible for long-term foster care means that a determination has been made by the juvenile court that family reunification is no longer a viable option." 8 C.F.R. § 204.11(a). A child adopted or placed in guardianship after receiving a dependency order continues to be considered eligible for long-term foster care under 8 C.F.R. §204.11(a), and, necessarily, remains considered a juvenile court dependent based on the prior dependency order.
[9] 8 C.F.R. §204.11(c)(6).

Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions
HQADN 70/23
Page 5

the court rulings or question whether the court's order was properly issued. Orders that include or are supplemented by specific findings of fact as to the above-listed rulings will usually be sufficient to establish eligibility for consent. Such findings need not be overly detailed, but must reflect that the juvenile court made an informed decision.

The role of the District Director in determining whether to grant express consent is limited to the purpose of determining special immigrant juvenile status, and not for making determinations of dependency status.[10]

If an order (or order supplemented with findings of fact, as described above) is not sufficient to establish a reasonable basis for consent, the adjudicator must review additional evidence to determine whether a reasonable factual basis exists for the court's rulings. To do so, the adjudicator may request that the petitioner provide actual records from the judicial proceeding; however, adjudicators must be mindful that confidentiality rules often restrict disclosure of records from juvenile-related proceedings, so seeking such records directly from the court may be inappropriate, depending on the applicable State law. In the alternative, the adjudicator may request the petition to provide an affidavit from the Court, or the state agency or department in whose custody the child has been placed, summarizing the evidence presented to the court. Additionally, if the applicant had obtained a grant of specific consent from ICE, the grant should be considered a favorable factor in establishing express consent. The adjudicator may also consider the evidence that provided the foundation for the granting of specific consent.

If an adjudicator encounters what s/he believes to be a fraudulently obtained order s/he should promptly notify a supervisor, who should immediately notify USCIS Headquarters, Office of Field Operations and Office of Program and Regulation Development, through designated channels, to coordinate appropriate follow-up.

Because express consent essentially is a determination that the order reflects a bona fide basis for special immigrant juvenile status, approval of an SIJ application itself shall serve as a grant of express consent.

**Validity of Juvenile Court Orders in Previously Detained Cases (Specific Consent)**

The adjudicator must be satisfied that the petitioner obtained specific consent from ICE where necessary. If specific consent was necessary but not timely obtained, a juvenile court dependency order is not valid and the petition must be denied. INA § 101(a)(27(J)(iii)(I); 8 C.F.R. § 204.11(c)(3). Please check with the local ICE juvenile coordinator who handled the case to determine whether specific consent was required, and if so, whether it was timely granted.

---

[10] H.R. Rep. No. 105-405, at 130 (1997)

Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions
HQADN 70/23
Page 6

## Inadmissibility

SIJ beneficiaries are excused from many requirements that other applicants for adjustment must meet. Most notably, SIJ applicants are excused from several grounds of inadmissibility,[11] including provisions prohibiting entry of those likely to become a public charge,[12] those without proper labor certification,[13] and those without a proper immigrant visa.[14] In addition, most other grounds of inadmissibility may be waived for humanitarian purposes, family unity, or when it is otherwise in the public interest. The only grounds of inadmissibility that are not waivable for SIJ applicants are those listed in INA§212(a)(2)(A), (B), and (C)[15] and (3)(A), (B), (C), and (E).

## Aging Out

Current regulations require that an applicant for SIJ adjustment must be under 21 years old, not only at the time of application, but also at the time of adjustment.[16] Failure to adjust prior to age 21 results in denial of the application, regardless of the merits of the underlying dependency order; this is known as "aging out." Applicants are strongly encouraged to submit petitions and applications in a timely fashion and to notify the agency when the risk of aging out is strong. In addition, District Offices should assess new applications to avoid the risk of SIJ age outs, and take the following precautions to prevent it:

- Schedule SIJ adjustment interviews well in advance of the petitioner's 21st birthday, or in jurisdictions where court dependency terminates before age 21, well in advance of that birth date (e.g. age 18 in New Jersey).
- Ensure proper completion of background checks, including fingerprint clearances and name-checks (this means all clearances should be scheduled no later than 60 days prior to the age-out date).
- Provide for expedited processing of cases at risk of aging out (e.g. in-person filing for applicants who age out within a year; priority interviews and fingerprinting; other appropriate administrative relief).

Officers are also reminded that, in many circumstances, Section 424 of the USAPATRIOT Act provides SIJ beneficiaries limited age-out protection by extending benefits eligibility for 45 days beyond the 21st birthday. Pursuant to Section 424(2), an alien who is the beneficiary of a petition or application filed on or before September 11, 2001, whose 21st birthday occurs after September 2001 is considered to be a child for 45 days after the alien's 21st birthday for purposes of adjudicating such petition or application.[17]

---

[11] See INA§245(h)(2)(A). In addition, the corresponding grounds of removal under INA §237(c) are also waived for juveniles granted SIJ.

[12] INA§212(a)(4)

[13] INA§212(a)(5)(A)

[14] INA§212(a)(7)(A)

[15] Except for a single instance of simple possession of 30 grams or less of marijuana.

[16] 8 CFR§205.1(a)(3)(iv)(A).

[17] This provision has been specifically applied to SIJ beneficiaries. *See Pierre v. McElroy*, 200 F.Supp.2d 251 (SDNY 2001). Note: This necessarily includes treating the juvenile as under juvenile court jurisdiction during the 45-day period.

Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions
HQADN 70/23
Page 7

## Fee Waivers

Adjudicators are reminded that, pursuant to 8 CFR 103.7(c), SIJ applicants may be eligible for fee waivers for forms I-360, I-485 and I-765. Requests for fee waivers should be adjudicated expeditiously, and consistent with prevailing policy guidance (see Memorandum from William Yates, Field Guidance on Granting Fee Waivers Pursuant to 8 CFR 103.7(c), March 4, 2004). In considering the applicant's inability to pay the fee, adjudicators should pay particularly close attention to fee waiver guidance relating to consideration of humanitarian or compassionate reasons in support of a request (Id., at 4). Recommendations on fee waiver requests must be forwarded to the appropriate supervisor for decision.

## Vienna Convention on Consular Relations

Adjudicators should not ask SIJ applicants to provide proof of compliance with the Vienna Convention on Consular Relations (VCCR). The VCCR, which has little or nothing to do with SIJ classification, includes reporting requirements for government agencies encountering foreign citizens. usually in the context of criminal proceedings, but also in guardianship and trusteeship situations. In most cases, if a juvenile was in either the criminal justice system or under the care of a guardian or a trustee, the relevant state agency would have had a duty to report to the juvenile's consulate and afford the juvenile an opportunity to contact the consulate. The VCCR places no burden of reporting on the juvenile, and is therefore outside the scope of USCIS's determination of eligibility for SIJ classification or adjustment.

## Further information

Questions relating to this memorandum should be directed through appropriate channels by phone or e-mail to Steven D. Heller (Operation and Regulations Developments, (202) 616-7435) or Leah Torino (Field Operations, (202) 514-2982).

## Index

Background ............................................................................................................................ 1
Effect of SIJ approval .......................................................................................................... 2
Consent by Department of Homeland Security ................................................................... 2
Documentation Requirements for SIJ Petitions .................................................................. 3
The Court Order .................................................................................................................... 4
Evidence to establish the best interests of the child not to return to home country ........... 4
Evidence to establish express consent .................................................................................. 4
Validity of Juvenile Court Orders in Previously Detained Cases (Specific Consent) ........ 5
Inadmissibility ...................................................................................................................... 6
Aging Out .............................................................................................................................. 6
Fee Waivers ........................................................................................................................... 7
Vienna Convention on Consular Relations ........................................................................... 7
Further information ............................................................................................................... 7
Index ...................................................................................................................................... 7

JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

MASSACHUSETTS DEPARTMENT OF SOCIAL SERVICES and Maragret BUKENYA

**(b)** County of Residence of First Listed Plaintiff _____ Suffolk _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Maureen O'Sullivan
Kaplan O' Sullivan & Friedman LLP
10 Winthrop Square 3rd Fl , Boston, MA 02110
(617) 482-4500

## DEFENDANTS

Denis RIORDAN, District Director of Boston District Office(CIS); Michael CHERTOFF, as Secretary of DHS, EDUARDO AGUIRRE, JR. as Director US CIS, DEPARTMENT OF HOMELAND SECURITY

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [x] 2  U.S. Government Defendant
- [ ] 3  Federal Question (U.S. Government Not a Party)
- [ ] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | **PERSONAL INJURY** | [ ] 620 Other Food & Drug | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 362 Personal Injury– Med. Malpractice | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 423 Withdrawal 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 365 Personal Injury — Product Liability | [ ] 630 Liquor Laws | | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 640 R.R. & Truck | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability | | [ ] 650 Airline Regs. | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 660 Occupational Safety/Health | [ ] 830 Patent [ ] 840 Trademark | [ ] 810 Selective Service [ ] 850 Securities/Commodities/ Exchange |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 891 Agricultural Acts |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 892 Economic Stabilization Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters [ ] 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 740 Railway Labor Act | **FEDERAL TAX SUITS** | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 220 Foreclosure | [ ] 442 Employment | **Habeas Corpus:** | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 790 Other Labor Litigation | | [x] 890 Other Statutory Actions |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 871 IRS —Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | [ ] 791 Empl. Ret. Inc. Security Act | | |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights [ ] 555 Prison Condition | | | |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from another district (specify)
- [ ] 6  Multidistrict Litigation
- [ ] 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION    (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint for mandamus and declaratory relief to enforce INA 101 (a)(27)(J) 8 USC 1101 (a)(27)(J)

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____     DOCKET NUMBER _____

DATE _____     SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05 10943 DPW**

### DSS and Margaret Bukenya v. Riordan

1.  Title of case (name of first party on each side only)_____

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    ___     I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    _X_     II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,        *Also complete AO 120 or AO 121
                    740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.             for patent, trademark or copyright cases

    ___     III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                    315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                    380, 385, 450, 891.

    ___     IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                    690, 810, 861-865, 870, 871, 875, 900.

    ___     V.      150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
        **NONE**

_____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                        YES ☐        NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                                        YES ☐        NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                        YES ☐        NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                        YES ☐        NO ☒

7.  Do <u>all</u> of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                                        YES ☐        NO ☐  Parties ( most) are

    governmental agencies.

            A.      If yes, in which division do <u>all</u> of the non-governmental parties reside?

                    Eastern Division ☐        Central Division ☐        Western Division ☐

            B.      If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
                    agencies,  residing in Massachusetts reside?

                    Eastern Division ☒        Central Division ☐        Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                                        YES ☐        NO ☒

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME     Maureen O'Sullivan _____ ADDRESS   Kaplan O'

Sullivan & Friedman LLP ,10 Winthrop Square 3rd Fl ,Boston, MA 02110 .

TELEPHONE NO.     (617) 482-4500 _____

                                                                        (Civil Cover Sheet.wpd  - 10/17/02)